## Vandergrift Estate.

16

Argued October 5, 1961. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

reargument refused January 26, 1962.

*Clyde W. Armstrong,* with him *Thorp, Reed & Armstrong,* for administrator d.b.n., appellant.

*Frank W. Ittel,* with him *G. Donald Gerlach,* and *Reed, Smith, Shaw & McClay,* for executors and trustees, appellants.

*Tice F. Ryan, Jr.,* with him *Wayland S. Bowser, Walter M. Newman,* and *Ryan, Newman, Geer & Goldring,* for Marjorie Holmes Vandergrift, appellant.

*William McC. Houston,* with him *Fred C. Houston, Jr., Armin H. Friedman,* and *Houston & Houston,* for executrix, appellant.

*John G. Buchanan, Jr.,* with him *John G. Buchanan, Rex Rowland,* and *Buchanan, Ingersoll, Rodewald,*

*Kyle & Buerger,* for Helen B. Mercer, Alice V. Gordon and Virginia Summerlin Sullivan, appellants.

*William H. Eckert,* with him *W. Gregg Kerr, Jr.,* and *Eckert, Seamans & Cherin,* for Virginia Spencer Estate, and *Carl Brandt,* guardian and trustee ad litem, appellees, and *Carl Brandt,* as guardian and trustee ad litem, appellees.

*Adie Allen Stevens, II,* with him *Frank A. McFerran, Jr.,* and *Kenney, Stevens, Hill & Clark,* for administrator of estate of John M. Vandergrift, appellee.

*Henry C. Herchenroether, Jr.,* with him *Alter, Wright & Barron,* for trustee in bankruptcy for J. Jay Vandergrift, appellee.

*John C. Hanna,* with him *Metz, Cook, Hanna & Kelly,* for Pittsburgh National Bank, surviving trustee, appellee.

*Tice F. Ryan, Jr., Wayland S. Bowser, Walter M. Newman,* and *Ryan, Newman, Geer and Goldring,* for Marjorie Holmes Vandergrift, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, January 2, 1962:

J. J. Vandergrift, a resident of Pittsburgh, died testate on December 26, 1899, survived by his second wife and five children.[1]

---

[1] By his first marriage, Vandergrift had nine children. Four of these children predeceased him; of the four children, only one, Benjamin W. Vandergrift, left issue, a daughter—then not less than nine years old—named Henrietta Vandergrift, later Henrietta V. McKay. She was Vandergrift's only living grandchild when he made his will on December 1, 1898. Of his second marriage, no children were born.

Vandergrift's will—obviously lawyer-drawn—provided, inter alia: (1) the first seven articles dispose of specific pieces of property and set forth the treatment of claims and advancements which involved the testator's relatives and friends; (2) the eighth article provided for legacies, including bequests of $100,000 to each of testator's five living children and a large bequest to testator's confidant, James I. Buchanan; (3) the ninth article gives "the rest and residue of [testator's] estate" to the executors, in trust, to "carry out the provisions and directions" of the will; (4) the tenth article creates a trust for testator's only living grandchild whose father predeceased testator; (5) the eleventh article provides the manner of disposition of the residue of the estate; (6) the twelfth article contains administrative provisions; (7) the thirteenth article appoints the executors; (8) the fourteenth article requests testator's children to counsel with James I. Buchanan.

Disposition of most of the present appeals depends, in large part, on the construction of Article XI which provides, inter alia: "ARTICLE XI. I will and direct that all the remainder of the rest and residue of my estate, real, personal, and mixed, be divided into two parts or portions by my executors, leaving the character of the property and the amount to be assigned to each portion to the discretion of my executors, and that one portion of such estate be given, transferred, and paid over to James I. Buchanan, my son Samuel H. Vandergrift, my son in law John A. Johnston and a Trust Company located in the City of Pittsburgh, Pennsylvania, to be selected by my executors, and that the other portion of said estate be given, transferred and paid over to the said James I. Buchanan, my son Samuel H. and my son in law John A. Johnston and another and different Trust Company located in the said City of Pittsburgh to be selected by my executors, each portion

of the said estate to be held by the said James I. Buchanan, Samuel H. Vandergrift, John A. Johnston and the said Trust Company as trustees, in trust to manage and control the same, to invest and keep invested the same, to collect and receive the rents, issues profits and income thereof; and after deducting expenses and reasonable compensation to the said trustees to pay over the net income thereof, as nearly in quarterly payments as may be done, to the following persons for and during the natural life of each, in the proportions following:

"To my son Samuel H. Vandergrift the one equal fifth part thereof.

"To my son Joseph B. Vandergrift the one equal fifth part thereof.

"To my daughter Kate V. Bingham, the one equal fifth part thereof.

"To my daughter Henrietta V. Johnston the one equal fifth part thereof.

"To my daughter Maggie F. Murphy the one equal fifth part thereof; and upon the death of each of my said sons and daughters, to pay, transfer, deliver and convey the one fifth of the principal of said trust funds or estates freed and discharged from this trust to the child or children of such deceased son or daughter, living at the time of the death of such son or daughter, and the issue, if any, of any deceased child or children. If any of my said sons or daughters shall die leaving but one child to survive him or her, and no issue of a deceased child, then such child shall receive the whole one fifth of said two trust funds or estates; if any of my said sons or daughters, shall die leaving more than one child to survive him or her, but no issue of a deceased child, then, the said one fifth of said trust funds or estates, shall be divided equally between or among said surviving children share and share alike; if any of my said sons or daughters shall die leaving a child or children and the issue of a deceased child or children

surviving him or her, then the said one fifth of said trust funds or estates shall be divided equally among such surviving child or children and the issue of a deceased child or children, the issue of a deceased child, counting as one in said division and taking the share his, her or their parent would have taken if living.

"If any of my said sons or daughters die either before or after my decease without leaving any child or any issue of a deceased child surviving him or her, then, the income from said share shall be paid to his or her surviving brothers and sisters for and during the natural life of each surviving brother and sister, and, upon the death of any one of said surviving brothers and sisters, the share of the principal of the said trust funds or estates to be paid over to the children and issue of children of such deceased surviving brother or sister shall be proportionately increased, that is to say, if any of my said sons or daughters shall so die without leaving any child, or any issue of a deceased child to survive him or her, then the share of the income to be paid to each of my surviving sons and daughters shall be increased to one fourth, and the said share of the principal of said trust funds or estates to be paid over upon the death of any one of such surviving sons, or daughters, to his or her children, and issue of deceased children shall be increased to one fourth and so on.".

Certain factual background is vital to an understanding of the instant controversy. Kate V. Bingham, a daughter of testator, died April 7, 1900 survived by Helen B. Mercer who is still living. Joseph B. Vandergrift, a son of testator, died May 23, 1915 survived by two sons, J. M. Vandergrift and J. Jay Vandergrift; the former died July 29, 1939[2] and the latter died Octo-

---

[2] When John M. Vandergrift died he was survived by his second wife, Norma L. Vandergrift who later married one George Dixon. Norma later died and her husband, i.e., the husband of the second wife of J. M. Vandergrift, claims a part of this estate.

ber 15, 1959.[3]  Samuel H. Vandergrift, a son of testator, died September 21, 1926 survived by Alice V. Gordon who is still living.  Henrietta V. Johnston, a daughter of testator, died March 28, 1930 survived by a daughter, Virginia Summerlin Spencer.  Virginia Summerlin had two children, George T. Summerlin, Jr., who died October 19, 1934 survived by a daughter, Virginia S. Sullivan, and John V. Summerlin, who died January 21, 1943 survived by three children, Harriet S. Humphrey, John V. Summerlin, Jr., and Dolores S. Kelchner.[4]  Upon the death of these four children of testator distributions of their respective shares of the principal of the trusts were made by the court and the propriety of such distributions is not in question.

The last surviving child of Vandergrift, Margaret F. Murphy, died July 3, 1959 *without issue* and her death gave rise to the instant controversy.

The Pittsburgh National Bank filed in the Orphans' Court of Allegheny County its final account in the trusts set up under Article XI for Margaret F. Murphy. At the audit three exceptions were filed to the account;[5] claims of the trustees in bankruptcy and former wife of

---

[3] In 1928, J. J. Vandergrift and his wife, Marjorie Holmes Vandergrift, were divorced; the latter is a judgment creditor and has issued two foreign attachments and an attachment execution upon these judgments totalling $184,584.60, naming as garnishees the trustee of the Jacob Vandergrift estate. In 1938, J. Jay Vandergrift went into bankruptcy and was later discharged. The trustee in bankruptcy claims the share of J. Jay Vandergrift, if any, in the Jacob Vandergrift estate.

[4] Dolores S. Kelchner was an adopted child. The court below held she was not entitled to share in this estate; from that ruling no appeal was taken.

[5] These exceptions filed on behalf of Alice V. Gordon and Helen Mercer, only living grandchildren of testator, questioned the $10,000 fee of trustee's counsel, the $35,000 commission of the trustee and sought to surcharge the trustee for $65,000, the amount of a capital gains tax arising from the post-mortem sale by the trustee of the securities in the trust.

J. Jay Vandergrift against his share, if any, in the estate were presented, and the manner of distribution of the principal of the trusts argued.

The auditing judge (RAHAUSER, J.) dismissed the exceptions filed to the account, determined that no intestacy arose under the trust provisions, sustained the claim of the trustee in bankruptcy to the J. Jay Vandergrift share in the estate, dismissed the claim to the J. Jay Vandergrift share in the estate by his former wife and judgment creditor and directed the distribution of the principal of the trusts "to the children of the five deceased children of the testator mentioned in Paragraph XI of the Will and to the issue of deceased children of testator's children, per stirpes". The court en banc affirmed the conclusions of the auditing judge with one important exception: whereas the auditing judge found that the interests of testator's various grandchildren and great grandchildren vested on the date of death of Margaret F. Murphy, the court en banc found such interests vested on the date of death of the respective parents of the several grandchildren subject to being divested by the death of Margaret F. Murphy with issue surviving her.

From the decree of the Orphans' Court of Allegheny County six appeals were taken.[6]

---

[6] For the sake of convenience we summarize these appeals.

*Appeal 127* was taken by Marjorie Holmes Vandergrift; she takes the position that the interest in this trust fund of J. M. Vandergrift was contingent upon his survival of Mrs. Murphy and, since he predeceased her, no interest passed to his estate, but instead the entire one fourth interest went to J. Jay Vandergrift who survived Mrs. Murphy; moreover, since the interest of J. Jay Vandergrift during Mrs. Murphy's lifetime was contingent it never passed to the trustee in bankruptcy and is now subject to her attachments.

*Appeal 129* was taken by the executors of Henrietta V. McKay whose father predeceased testator. They take the position that, as to the remainder interest in this trust fund, testator died intestate

The first and most important question is whether, upon the death of Mrs. Murphy, the remainder interest in this trust fund passed by way of intestacy[7] or under the terms of the will. Corollary to this question is the problem whether, in the event there is no intestacy, the remainder interest goes to those grandchildren and great grandchildren living when their respective parent or grandparent died or only to such as survived Mrs. Murphy.[8] Solution of these problems depends upon the

---

and, therefore, this estate shares to the extent of a one fifth interest in the fund.

*Appeal 133* was taken by the executrix of J. Jay Vandergrift. She takes the position that the remainder interest vested at the time of Mrs. Murphy's death in the then living grandchildren and the then living issue of testator's deceased grandchildren and, therefore, in 1938 J. Jay Vandergrift did not have when he became bankrupt such an interest as would pass by operation of law to his trustee in bankruptcy.

*Appeal 134* was taken by the administrator of Frances G. Vandergrift, deceased second wife of testator. He takes the position that testator died intestate as to the remainder interest of this fund.

*Appeals 137, 138 and 139* were taken by Alice Gordon and Helen Mercer, testator's only living grandchildren, and Virginia S. Sullivan, a great, great grandchild. In addition to attacking the counsel fee and trustee's commission and seeking to surcharge the trustee, they take the position that there was no intestacy but that the court en banc erred in not ruling that only those descendants of the children named in Article XI who were living when Mrs. Murphy died could take the remainder interest.

[7] If there was an intestacy, the share which would go to the estate of testator's second wife might have been forfeited by the pre-marriage settlement referred to in Article III of the will or by the release signed by her on June 4, 1901. By the same token, if there is an intestacy, two great grandchildren of testator—daughters of Henrietta McKay would take, whereas otherwise they would not.

[8] The determination of this question is particularly important to the J. M. Vandergrift estate, the J. Jay Vandergrift estate, Alice Gordon, Helen Mercer and Virginia Sullivan.

provisions of the will in its entirety, with particular emphasis upon the terms of Article XI.

In Article XI testator created two trusts alike in every respect, except the corporate trustees were to be different. Of the net income from the trusts, "one equal fifth part" was to be paid to each of his five named living children "for and during the natural life of each". Testator then provided a scheme of distribution of one fifth of the principal of each fund upon the death of each one of his children and such distribution varied according to the descendants which said child dying should then leave: (1) if one child and no issue of a deceased child or children, the one child would take all; (2) if more than one child and no issue of a deceased child or children, then an equal division between such children; (3) if one child or more than one child and issue of a deceased child or children, then the one fifth share would go to the child or children and the issue of a deceased child or children, the latter taking per stirpes. Up to this point in the will testator's intent is clear; he directed a distribution along blood lines, required that the takers be alive when his sons or daughters died, provided equality of distribution and a per stirpital distribution for the issue of any deceased grandchild or grandchildren.

Next and most important are the provisions for the contingency which might arise if one of testator's children—before or after testator's death—should die leaving no child nor issue of a deceased child. In such a contingency, the income from such deceased child's share was to be paid "to his or her surviving brothers and sisters" for life. Testator then provided that "upon the death of any one of said surviving brothers and sisters, the share of the principal of the said trust funds or estates to be paid over to the children and issue of children of such deceased surviving brother or sister shall be proportionately increased . . . ." Desirous to

clarify this clause, testator then stated that in the event *any* son or daughter died without leaving a child or issue of a deceased child, the share of the income for each of his "surviving" sons and daughters shall be increased to one-fourth and the share of principal likewise increased to one-fourth "and so on". By the use of the words "and so on" it is clear testator intended to provide the same manner of distribution if more than one of his children died without children or issue of deceased children.

Two questions must be resolved: (1) upon the death of Mrs. Murphy, testator's last surviving child, did an intestacy occur as to the principal of her trust fund?; (2) if not, does the class of takers include only those who survived Mrs. Murphy?

In resolving these questions certain well established principles of law must be kept in mind: (1) the intent of the maker of this will must be ascertained by a consideration of the entire will, read in the light of the circumstances surrounding the maker when the will was made: *Conlin Estate,* 388 Pa. 483, 131 A. 2d 117; *Beisgen Estate,* 387 Pa. 425, 128 A. 2d 52; *Weaver Estate,* 390 Pa. 128, 134 A. 2d 675; (2) a will must be so construed, if possible, as to give effect to every word employed by the testator and a construction which renders any of the words nugatory and futile must be rejected: *Siple v. Greumelli,* 357 Pa. 237, 53 A. 2d 607; *Carmany Estate,* 357 Pa. 296, 53 A. 2d 731; *Collins Estate,* 393 Pa. 519, 143 A. 2d 45; *Hollenbaugh Estate,* 402 Pa. 256, 167 A. 2d 270; (3) there is a presumption that: "One who writes a will is presumed to intend to dispose of all his estate and not to die intestate as to any portion thereof [citing cases]. If possible to do so, a will must be construed to avoid an intestacy [citing cases]": *Carmany Estate,* supra, 357 Pa. 296, 299, 53 A. 2d 731. See also: *Grier Estate,* 403 Pa. 517, 170 A. 2d 545; *Frambes Estate,* 382 Pa. 398, 115 A. 2d 165; *Lyle*

*Estate,* 374 Pa. 344, 97 A. 2d 830. However, in *DeSilver's Estate,* 142 Pa. 74, 21 A. 882, we approved the following language of Judge PENROSE (pp. 75, 76): "The rights conferred by the intestate laws are only taken away by a will which effectually disposes of the entire estate of the decedent; and, while a construction is not to be adopted, if it can be avoided, which will lead to an intestacy, *interpretation is never to assume the proportions of reformation".* (Emphasis supplied) Furthermore, as we said in *Wainwright Estate,* 376 Pa. 161, 165, 166, 101 A. 2d 724: "'. . . there is a presumption testator intends to dispose of his whole estate. Such presumption, however, is met by an equally potent presumption that an heir is not to be disinherited except by plain words or necessary implication. . . . Neither presumption, however, can be permitted to defeat the intention of the testator which is expressed in apt words or appears by clear implication.'" With these principles in mind we endeavor to ascertain from the language employed in this will the intent of Jacob Vandergrift.

One thing is self-evident—testator fully recognized that a contingency might arise in which a son or a daughter might survive him leaving neither a child, children nor issue of a deceased child or children just as Mrs. Murphy did. It so happened that this contingency arose on the death of the last of testator's children and at a time when *all* testator's other children had long since been dead. That testator contemplated that such a contingency might arise on the death of his *last* surviving child is evident for he stated "If *any* of my said sons and daughters", etc. He did not state if *"any* but the last surviving child die", etc.—testator's use of the word *"any"* included the *first* to die as well as the *last* to die.

When Mrs. Murphy died she had no *"surviving"* brothers or sisters if the word "surviving" be inter-

preted as "remaining alive". Can it then be said that this testator in this carefully drawn will omitted the contingency of the *last* living child dying without issue or child? We think not. Bearing in mind that by the employment of the word "any" testator clearly contemplated the last to die as well as the first to die, to find an intestacy we must reform the will and remove from the will the devise of the share of the last dying child to brothers and sisters and ascribe to testator the intent to have excluded this contingency if the contingency arose on the death of the *last* child. We would have to reform this paragraph of the will to read "[i]f any of my said sons and daughters except the last to die". The only alternative to give effect to that which was clearly the testamentary intent is to read the word "surviving" as "other" and for such construction there is ample precedent.

In *Lapsley v. Lapsley,* 9 Pa. 130, testator devised certain land among his four sons equally, further providing " 'if any of my sons should die without issue, their part or portion shall be divided between the surviving brothers . . . .' " This Court construed the word "surviving" to mean "other". The Court quoted (p. 131) with approval the following language in 2 Pow. on Dev. 723: "If . . . property be given to several persons, with a proviso that, in case of the death of any without leaving children at their death, their shares shall go to the survivors, but in the case of the death of any leaving children, then their shares to belong to such children; if one of the devisees die leaving issue, and then another die not leaving children, the share of the latter will go as well to the surviving objects as to the children of the deceased objects; and, by parity of reasoning, *if all the legatees were then dead, leaving children, so that there were in fact no survivors,* the children would take the whole". In *Lewis' Appeal,* 18 Pa. 318, testatrix devised certain real estate to a niece

for life directing that, after the niece's death, the real estate should be sold and of the net proceeds she directed that they be divided in a specified manner to her niece's children. She then provided: "If one or more of the said children should happen to die before their mother, without leaving any children, the share of such child or children so dying, shall be equally distributed among the survivors of the said brothers and sisters; if, however, such child or children so dying shall leave a child or children, such child or children shall be entitled to their parent's share". When the life tenant died only one of her five children was living; two sons had died without issue, one son left two children and one daughter left three children. This Court awarded the shares of the sons who died without issue to the surviving daughter of the life tenant *and* the children of the deceased brother and sister, the latter taking per stirpes. See also: *Bacon's Estate,* 202 Pa. 535, 52 A. 135; *Vance's Estate,* 209 Pa. 561, 58 A. 1063.

In *Fox's Estate,* 222 Pa. 108, 70 A. 954, testator left his residuary estate in trust to pay one quarter of the income to each of his four daughters for life; upon the death of each daughter, one quarter of the principal was to be conveyed to her issue; and if any of his daughters died without leaving issue, the share of the daughter so dying was to be held for the use and benefit of "her surviving sisters" in the same manner as their original shares. Two daughters died with issue and the principal of each such daughter's original share was distributed to such issue. A third daughter died without issue. The Court held the share of the daughter so dying should be distributed in equal parts between the surviving daughter and the children, per stirpes, of the two daughters who died first. The Court said (p. 113), inter alia: "That the issue of a sister dying first should . . . be cut off from participation in the share of a sister dying subsequently without issue, would be

giving an accidental and irrelevant fact an effect contrary to the manifest general intent. . . . As said by the auditing judge below: 'It is well settled, however, that the word survivor or surviving, will be understood as the equivalent of "other", where in any other sense it would lead to an intestacy or to an inequality among those standing in the same degree of relationship to the testator, or to a distribution not in accordance with the general scheme of the will in its entirety . . . .' . . . he [the testator] did not mean to make shares of any group of his grandchildren dependent on the accident of their mother's survival of her childless sister. The word 'other' very clearly expresses his general intent and that is the sense in which he used the word 'survivors.' "

In *Galli's Estate*, 340 Pa. 561, 17 A. 2d 899, parties interested in an estate entered into an agreement whereby the property was placed in trust to pay the income to named nephews and nieces of decedent in equal shares during their lives, with remainders to their children; if any nephew or niece died without issue in trust "for the surviving nephews and nieces" and their issue on the same terms. Two nephews died leaving children and then another nephew died without issue. Later the other two life tenants died leaving children. This Court held that the children of the two life tenants who predeceased the life tenant who died without issue were entitled to participate in distribution of the principal of the share of the childless life tenant. All of these authorities construed the word "surviving" as "other" in situations closely apposite to the case at bar.

An examination of this will reveals clearly that testator intended an equality of treatment of his children and their children; that the terms of Articles X and XI reveal an intent to restrict so far as possible the distribution of his estate along blood lines; that, by the use of the word "any", testator intended to include the

last child to die as well as the first to die; that testator by the language employed clearly intended a disposition of *all* his estate by the will; that the construction of "surviving" as "other" is the only manner in which testator's plan and scheme for the disposition of his property can be effected. Testator did not intend an intestacy to occur; in fact, none has occurred. The court below was correct in its ruling that, upon Mrs. Murphy's death, no intestacy as to her one fifth equal part of this trust occurred.

Our next inquiry is whether the interests of the grandchildren and great grandchildren of testator in the principal of this trust vested upon the death of their respective parents—children of testator—subject to being divested only if Mrs. Murphy died with issue or whether such interests were contingent, the contingencies being the death of Mrs. Murphy without issue *and* the survival by the particular grandchild or great grandchildren at the time of Mrs. Murphy's death. The auditing judge was of the opinion that the class of takers was to be determined as of the date of Mrs. Murphy's death and that the interest of the takers vested as of that date. The court en banc was of the opinion, relying on *Straus Estate,* 351 Pa. 136, 40 A. 2d 402, that the interests of the various grandchildren vested on the date of death of the respective parent of the various grandchildren.

In *Straus,* supra, the testator provided for certain trusts for his children for life, the trusts to end upon the death of each life beneficiary and the principal to be distributed to the life beneficiaries' living child or children or the issue of a deceased child. The will further provided that if a life beneficiary died without issue such share should become part of the same trust. This particular item of the will reads as follows: ". . . In Trust, during the lifetime of my said children respectively, so that upon the death of each of my said

children the principal of their several shares shall pass undiminished to the living child or children and issue of children deceased of my said child so dying (such issue taking the share which their parent would have taken if living) ; but if any of my said children should die without leaving child or children living at the time of their respective deaths, or issue then living of children deceased, then I Direct that the share of such my child so dying shall fall into the residue of my estate, to be held by my said Executors or Trustees upon the same Trusts and for the same Purposes as I have directed as to the said residue." One of testator's daughters, Sally, died survived by a son, Frederick, who later died leaving four children. Thereafter Laura, another of testator's daughters died, without issue. The executor of Frederick's estate claimed a one-fourth portion of the corpus set aside for the life of Laura and this claim was opposed by Frederick's four children. The court held that Frederick's interest became vested when he survived his mother's death and therefore awarded the one-fourth portion of the corpus to the executor of Frederick's estate. Mr. Justice STEARNE speaking for this Court stated (pp. 138-139) : "Frederick's interest in the corpus of the share upon which his mother enjoyed a life estate was *contingent*. In order to take, Frederick was required to be *living* at his mother's death: Frasier v. Scranton Gas & Water Co., 249 Pa. 570, 95 A. 256; Roop's Estate, 274 Pa. 117, 117 A. 787; Benedict's Estate, 70 Pa. Superior Ct. 51. When Frederick did survive his mother, his interest in that portion of the trust became *vested*: Hinkson v. Lees, 181 Pa. 225, 37 A. 338; McGlinn's Estate, 320 Pa. 389, 182 A. 495. While conceding the correctness of these principles, appellants contend that the words of the will clearly indicate testator's intent to affix the same contingency to the accruing share as he did to the original one, to wit: *the survival of Frederick at the*

*death of Laura.* We agree agree with Judge SINKLER, the auditing judge, who said: 'Since the trusts for his children were the only trusts created, it is clear that the testator intended the additional share to be treated as though it had formed part of the original residuary estate. The use of the phrase "then I direct" does not change a vested interest into a contingent interest. The word 'then' is used in this will as a conjunction meaning 'in that event', not as an adverb meaning 'at that time.' [Frederick] had a vested interest in the Laura Straus Hibbs share subject only to being divested by the birth of issue to her.' See Packer's Estate (No. 2), 246 Pa. 116, 92 A. 70; Neel's Estate, 252 Pa. 394, 97 A. 502; Wheaton Coal Co. v. Harris, 288 Pa. 294, 135 A. 637; McGlinn's Estate, supra."

We believe that *Straus* is most apposite to the present situation. From an examination of this will, particularly Article XI, we are of the opinion that those grandchildren and great grandchildren who were alive at the time of the death of their respective parents or grandparent received a vested interest in the one-fifth equal part of the trusts created for Margaret F. Murphy for life, subject to being divested however if at the time of Mrs. Murphy's death she died with issue. In summary, upon the death of Mrs. Murphy without issue *an intestacy did not occur*: on the contrary, when Mrs. Murphy's brothers and sisters died each of the descendants of such brothers and sisters alive at the time of such deaths received a vested interest subject to being divested only if Mrs. Murphy died with issue.

Three of these appeals attack the reasonableness and propriety of the trustee's counsel fee and the trustee's commission allowed by the court below and seek to surcharge the trustee for $65,554.48, the amount of a capital gains tax which, it is alleged, the trustee needlessly incurred.

The attack on the $10,000 counsel fee is two-fold: (1) that it is excessive and (2) that counsel's services

upon which the fee is based included not only settlement of the trust estate but also representation of the trustee in garnishment proceedings instituted by Marjorie Holmes Vandergrift.

In *Good's Estate,* 150 Pa. 307, 310, 24 A. 623, we stated: "The amount of fees to be allowed to counsel, always a subject of delicacy if not difficulty, is one peculiarly within the discretion of the court of first instance.[9] Its opportunities of judging the exact amount of labor, skill and responsibility involved, as well as its knowledge of the rate of professional compensation usual at the time and place, are necessarily greater than ours, and its judgment should not be interfered with except for plain error."[10]

Initially, it is urged that this $10,000 fee exceeds the Allegheny County minimum fee bill in respect to services rendered by an attorney to a trustee; such fact, however, does not per se make excessive the present counsel fee for that fee bill sets the *minimum,* not the *maximum,* fee to be charged and the amount of counsel fees must be based, as always, on the character and extent of the services rendered as well as the responsibility involved. Furthermore, it is contended that some of the services for which counsel has charged were in connection with several proceedings wherein the trustee was named as garnishee and that such services should be charged only against the share of the distributee involved and not against the trust estate. With that contention we disagree. In *Kutz v. Nolan,* 224 Pa. 262, 265, 266, 73 A. 555, we said: "*A garnishee who is a trustee under a valid deed of trust is not a mere stakeholder,* nor simply a debtor or one who has in his

---

[9] See also: *Brown's Estate,* 343 Pa. 19, 30, 21 A. 2d 898; *Berkowitz's Estate (No. 2),* 344 Pa. 485, 486, 26 A. 2d 295; *Ward Estate,* 350 Pa. 144, 38 A. 2d 50.

[10] See also: *Huffman Estate (No. 3),* 349 Pa. 59, 64, 36 A. 2d 640.

possession the property of the defendant. He has possession of the property by virtue of his legal title thereto. *He is charged with active duties with regard to it and is responsible not only to the defendant, but to the other beneficiaries named in the deed of trust.* It is, therefore, incumbent upon him to preserve and protect the property for all the beneficiaries, and to administer it strictly in compliance with the terms of the trust. Failing to perform this duty he is liable for any injury sustained by any person beneficially interested. (Emphasis supplied) . . . . A bona fide creditor of the cestui que trust, enforcing payment of a valid judgment, may subject the trust estate to the payment of his debt; but this he can only do by due process of law. If the trustee fail to compel the creditor to proceed in a regular and legal way to enforce his claim against the estate, he is liable to the interested parties who have been injured by his negligent conduct. The failure of the trustee in this respect subjects him to the same consequences as if he permit the estate to be dissipated or lost in any other illegal way or by any other illegal means . . . *There are other interests than those of the cestui que trust in the fund attached which are affected by enforcement of the attachment execution, and it is the duty of the trustee to protect those interests* and not permit them to suffer by reason of any action of the cestui que trust." (Emphasis supplied) See also: *Musser's Estate,* 341 Pa. 1, 7, 17 A. 2d 411. In the case at bar, it was the duty of the trustee to actively take part in the garnishment proceedings; in the performance of that duty, services rendered by the trustee's counsel enured to the benefit of all the beneficiaries of the trust fund and the trust should bear the cost of such services. We find in the approval of this $10,000 counsel fee by the court below neither an abuse of discretion nor an error of law.

Next, the trustee's $35,000 commission is challenged on the ground that, since the trustee liquidated the

trust assets and thereby incurred a capital gains tax of approximately $65,000 instead of distributing such assets in kind, the trustee should be penalized by depriving it of a commission, in whole or in part. For an understanding of the trustee's action certain factual data must be considered: (1) a letter dated July 10, 1959 to the trustee from New York counsel of Alice B. Gordon inquired whether a judicial accounting was necessary;[11] (2) a letter dated August 18, 1959 to the trustee from New York counsel of Helen B. Mercer inquired when the trustee's account would be completed and available, whether the trustee contemplated a court accounting or an amicable accounting between the parties and "whether the trust assets are such that a portion of the corpus could be distributed in kind";[12] (3) a letter dated October 1, 1959 to the trustee from counsel for Helen Mercer stated she "would prefer to have the bulk of her share distributed in kind, if this is feasible" and requested a list of securities in the trust "with their Federal income tax costs".[13] On September 16, 1959, counsel for the trustee submitted a written opinion in which he advised the trustee that, under the circumstances existing in connection with the termination of the trust, the trustee would "most properly discharge [its] responsibilities by converting the assets of the estate into cash". When these securities of

[11] To this trustee replied that a judicial accounting was necessary.

[12] Counsel was notified by the trustee on October 7, 1959 that distribution of the trust assets would have to be made by the court, that it was possible an intestacy might result, that the share of one of the probable distributees had been attached and that the trustee was proceeding with the liquidation of the investments and preparing to file an account.

[13] To this the trustee replied that questions of distribution had arisen which must be submitted for court determination and that, under the circumstances, the trustee considered it necessary to liquidate the investments and that the trustee was "now proceeding with such liquidation."

the trust were sold in October 1959 a gross long-term capital gain for federal income tax purposes of $258,-217.91 was realized upon which a tax of $65,554.48 was paid. It is now urged the securities should not have been sold but distributed in kind and that, had this been done, the tax would have been avoided.

*Ordinarily,* the request of distributees to receive in kind the assets of a trust or an estate must be honored if the sale of such assets "is not reasonably necessary to pay debts or to make distribution": *Minichello Estate,* 368 Pa. 639, 644, 84 A. 2d 511. However, such a rule must yield to the exigencies of the particular situation which exists in the trust or estate. In the instant trust, a very serious question was presented to the trustee in the construction of this will, particularly Article XI; until that question could be determined by the court neither the *identity* of nor the *share* of the ultimate distributees of the corpus of that trust should be known. In addition, part, if not all, of the share of one possible distributee might be subject to the claim of his creditors. Faced with this situation, the trustee sought the advice of its counsel.[14] The record indicates that the trustee fully considered its counsel's advice and the possibility of a capital gains tax and then, after a thorough and independent study of all possible angles involved in this situation, concluded that the ultimate best interests of the possible trust beneficiaries required a liquidation and conversion into cash of the securities forming part of the corpus of the trust. Our review of the record supports the opinion of the court below that "the trustee followed the only prudent course" and is not subject to surcharge. *Jones*

---

[14] Where a fiduciary acts upon the advice of counsel, such fact is "a factor to be considered in determining good faith, but is not a blanket of immunity in all circumstances": *Borden Trust*, 358 Pa. 138, 143, 56 A. 2d 108; *Corr Estate*, 358 Pa. 591, 600, 58 A. 2d 347. Cf: *Kohler Estate*, 348 Pa. 55, 33 A. 2d 920.

*Estate,* 400 Pa. 545, 162 A. 2d 408, relied on by these appellants, is not presently apposite. The action of the court below in allowing a $35,000 commission to the trustee is affirmed.

Lastly, does the interest of J. Jay Vandergrift, vested on the death of Joseph B. Vandergrift, subject to being divested on Mrs. Murphy's death with issue surviving, go to his former wife, an attaching creditor, or to his trustee in bankruptcy?

We believe the auditing judge in his opinion correctly and adequately resolved this question: "The attachment execution creditor contends that her attachment has priority over the claim of the party in bankruptcy. She contends that her claim as an attachment execution creditor is based on an obligation that is not discharged under Section 17 of the Bankruptcy Act. She contends in addition that the Bankruptcy Act did not contemplate that the proceeding would be open indefinitely and that the proceeding in bankruptcy could not be held open for 22 years, in order to collect, reduce to money, and distribute this estate. She contends also that the valuation of the debtor's property in the Bankruptcy Act means the amount of property that can be made available for payment of debt within a reasonable period of time from the inception of the bankruptcy proceeding, citing Syracuse Engineering Co. v. Haight, 110 F. 2d 468.

"The Court is of the opinion the case last cited is not applicable here, and that whatever interest J. Jay Vandergrift had in this trust estate passed to his Trustee in Bankruptcy on April 20, 1938. The trustee of this trust estate was properly notified of the interest of the Trustee in Bankruptcy, November 22, 1938. This action was taken prior to any action that was commenced by the attachment execution creditor.

"J. Jay Vandergrift had a transmissible interest in the Trust Estate created under Section XI of the Will

of Jacob J. Vandergrift. The principle applicable here is set forth in Brooke's Estate, 214 Pa. 46.

"In Brooke's Estate, 214 Pa. 46, 63 A. 411 (1906), the testator left his real estate in trust for his daughter, Emeline, for life with remainder to her surviving children and in default of such child or children then to testator's daughter, Sarah. Sarah predeceased Emeline, leaving Emeline and a brother as her only heirs at law. Emeline had one child who survived Sarah, but predeceased Emeline. The trustee petitioned under the Price Act to sell real estate. Emeline and her brother joined in the petition. The residuary heirs under testator's will objected to the sale on the ground that Sarah never took an interest in the real estate because she predeceased Emeline's child and the remainder fell into the residuary estate. The Court held that Sarah's remainder may have been technically contingent, but it was nevertheless transmissible and passed to her heirs at law—her sister, Emeline, and her brother. The lower court (affirmed per curiam by the Supreme Court) said at page 48: 'But the distinction [between contingent and vested subject to being divested] is of little importance, since the chief difference between a vested remainder and one that is contingent is that the latter may be destroyed by determination of the particular estate before the happening of the contingency . . . while a vested remainder would simply be accelerated; and unless the contingency is one which affects the capacity to take, a contingent remainder or other contingent interest is transmissible, even though not, in the technical sense, vested: Gray on Perpetuities, sec. 118; . . . Upon this subject the law is thus stated by Chancellor Kent: "It is well settled that all contingent interests of inheritance . . . where the person who is to take is certain, are transmissible by descent and are devisable and assignable." '

"The interest here of J. Jay Vandergrift being a transmissible interest passed to the Trustee in Bank-

ruptcy. Dickson Estate, 396 Pa. 371, is a case in which many of the facts were similar to those presently before the Court. The opinion of the Court is recited to show that there the Court had no hesitation in stating that the interest of the bankrupt passed to the Trustee in Bankruptcy.

"The pertinent part of the opinion is stated on page 372 and page 373 as follows: 'The life tenant, Arthur G. Dickson, died on March 17, 1957. Samuel Dickson's testamentary trustees thereafter filed a final account, at the audit of which Arthur's executor claimed that his estate was entitled to part of the principal by virtue of an intestacy which occurred because five of the seven nieces of testator's wife who survived the testator predeceased Arthur. The Orphans' Court dismissed this claim, and correctly held (1) that all seven nieces of testator's wife who were living at the death of the testator were entitled to take under his will; (2) that there is no intestacy; and (3) *that in any event Arthur's executor had no interest in the estate because of Arthur's bankruptcy proceeding in 1932.'*

"In Dickson Estate, 378 Pa. 48, 105 A. 2d 156, Arthur G. Dickson claimed at the audit of the Fourth Account of the trustee under the will of Samuel Dickson, his father, that he was entitled to four-sevenths of the principal of the trust because an intestacy arose by virtue of a combination of two facts—(1) at 79 years of age and in his physical condition he was unable to have any children or issue, and four of the nieces of his father's wife who were living at the time of testator's death had since died. This Court dismissed these contentions and said, inter alia (pages 49, 51): '. . . Dickson no longer has a life estate . . . .

" *'Dickson went into bankruptcy in 1932. The trustee in bankruptcy sold at public auction all the right, title and interest of the bankrupt under the will of his father, Samuel Dickson, including his life estate in the net income therefrom.'*

"The Bankruptcy Act of July 1, 1898, 30 Stat. at L. 544, in effect on the date (April 21, 1938) J. Jay Vandergrift filed his voluntary petition and was adjudicated a bankrupt, provided (11 U.S.C.A. 110) :

"'(a) The trustee of the estate of a bankrupt and his successor or successors, if any, upon his or their appointment and qualification, shall in turn be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title, except insofar as it is to property which is held to be exempt, to all of the following kinds of property wherever located . . . (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered . . .'

"The Court is, therefore, of the opinion that the claim of the Trustee in Bankruptcy has priority here, and that it must be satisfied before that of Marjorie Holmes Vandergrift, the attachment execution creditor."

Decree affirmed.

---

CONCURRING AND DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

We have repeatedly said that a Court has no right to rewrite a testator's will. It is not what we think testator should have said, or what we think he would have said if he had foreseen the present situation, or even what the Court thinks he meant to say—it is what is the meaning of his words: *Althouse Estate,* 404 Pa. 412, 172 A. 2d 146; *Cannistra Estate,* 384 Pa. 605, 121 A. 2d 157; *Sowers Estate,* 383 Pa. 566, 119 A. 2d 60; *Britt Estate,* 369 Pa. 450, 87 A. 2d 243.

Rarely will one find a testamentary trust whose dispositive provisions are as minutely and aptly drawn.

42

For example, in Article XI, which relevantly is the most important provision, testator gave the net income from one equal fifth part of his residuary trust estate to (each of his five named children which included) Maggie for life and then specifically provided that upon her death the (1/5th of the) principal shall be paid to Maggie's child or children *living at her death,* and the issue, if any, of any of her deceased child or children. He then clearly and specifically provided that (1) if any of his said sons or daughters, i.e., Maggie, shall die leaving *but one child to survive* her *and no issue* of a deceased child, then such child shall receive the whole one-fifth of the principal; (2) if* Maggie shall die leaving *more than one child to survive* her, *but no issue* of a deceased child, then the said one-fifth shall be divided equally between said *surviving* children, share and share alike; (3) if* Maggie shall die *leaving a child or children, and the issue* of a deceased child or children *surviving* her, then the said one-fifth shall be divided equally among such *surviving* child or children and the issue of a deceased child or children, the issue of a deceased child counting as one in said division and taking the share his, her or their parent would have taken if living.

Just try to substitute the word "other" for the word "surviving", as the majority opinion advocates, and the result is a conglomeration of meaningless language.

Then there follows the gift which gives rise to the present appeal. Testator provided: "If any of my said sons or daughters [Maggie] die either before or after my decease *without leaving any child or any issue*** of a deceased child *surviving* him or *her* [as occurred in this case], then, the *income* from said share shall be *paid to his or her surviving brothers and sisters* [there were none] for and during the natural life of *each*

---

* Any of his said sons or daughters, i.e.
** Italics throughout, ours.

*surviving* brother and sister [there were none] and, upon the death *of any one of said surviving* brothers and sisters [there were none], the share of the principal of the said trust funds or estates to be paid over to the children and issue of children of such deceased *surviving* brother or sister *shall be proportionally increased,* that is to say, if any of my said sons or daughters shall so die without leaving any child, or any issue of a deceased child *to survive* him or her, then the *share* of *the income to be paid to each of my surviving* sons and daughters *shall be increased to one-fourth,* and the said share of the principal of said trust funds or estates to be paid over upon the death of any one of such *surviving* sons, or daughters, to his or her children, and issue of deceased children shall be increased to one-fourth and so on."

How can we interpret the word "surviving" in this gift to mean "other" when in this and in every other part of his will testator clearly meant "surviving" when he said "surviving", and "then living" when he meant "then living", and "to survive him or her" when he meant "to survive him or her." Testator used the word "survive" several times, and he used the word *"surviving"* ten times, and in each instance he clearly and accurately demonstrated that he knew and meant what he said, viz: "survive" meant "survive", and "surviving" meant "surviving"—it didn't mean "other", or anything except "surviving".

The one contingency which testator did not foresee and provide for happened, namely, the death of his *last* surviving child, Maggie, without leaving a child or issue, or even a brother or sister surviving her. To interpret the word "surviving" as "other" is impossible, unless we ignore or distort his clear language and rewrite his will.

The majority opinion, ignoring the clear and apt language of Vandergrift's will, gives this trust prin-

cipal not to the living but to grandchildren and great grandchildren who survive not Maggie but testator's sons or daughters respectively even though they are dead at Maggie's death. The Court bases its interpretation and conclusion on the scheme of testator's will. The scheme of testator's will does not rebut but on the contrary confirms his clear and apt language. A careful examination of testator's minutely drawn will quickly discloses that upon the death of each of his children, as well as upon the happening of a particular event, he gave his income or principal (as the case may be) not to the dead but to *the then living*.

The majority invoke the presumption against intestacy, but there is another presumption of equal force and effect, namely the presumption that an heir is not to be disinherited except by plain words or necessary implication; and when both can apply they offset each other: *Conlin Estate*, 388 Pa. 483, 492, 131 A. 2d 117; *Beisgen Estate*, 387 Pa. 425, 128 A. 2d 52; *Bigony Estate*, 397 Pa. 102, 152 A. 2d 901. The truth of the matter is, irrespective of the aforesaid presumptions, that nearly everyone abhors an intestacy and consciously or unconsciously seeks to avoid it, and this is especially true where as here testator undoubtedly wished to dispose by will of his entire estate. But similar cases frequently arise where this Court has held that an intestacy exists even though testator unquestionably intended to dispose by will of his entire estate. Many examples could be given, but one or two simple ones will suffice: A husband with no issue leaves all his property to his wife, his wife predeceases him; a widow leaves everything to her child or children, they predecease her without leaving issue; or a testator intending to bequeath and devise his entire estate creates a residuary estate which violates the rule against perpetuities, or gives his residuary estate to charity within 30 days of his death. We cannot, just in order

to avoid an intestacy, ignore the clear apt language of Vandergrift's will and distort "surviving" to mean "other" when he many times clearly showed that was not his meaning or intent. This is especially so when distorting his language would result in disinheriting some of his heirs.

Considering the plain and unambiguous language of his entire will, it is clear that in the situation which has arisen testator failed to dispose of this one-fifth share of his residuary trust estate and consequently as to this share he died intestate and the principal goes to his next of kin under the intestate laws.

With respect to (a) the counsel fee and (b) the trustee's commission and (c) the claim of the trustee in bankruptcy, I agree with the majority opinion.