Jones Estate.

Argued March 17, 1960. Before JONES, C. J., MUS-MANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Philip E. Brockway*, with him *Brockway & Brockway*, for executor.

*W. Walter Braham*, with him *Thomas C. Cochran, Jr.*, for executor of widow and executors of appointees of widow.

*David Goodwin*, with him *Fruit & Francis*, for appointee of testator.

*Milford L. McBride, Jr,.* with him *Milford L. Mc-Bride,* and *McBride and McBride,* for appointee of testator.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 29, 1960:

Hugh O. Jones, a resident of Mercer County, died testate on March 4, 1950, survived by his widow, Ella Jones, two brothers, T. R. Jones and William Jones, and two sisters, Mary Jones Lees and Margaret Jones Egan. On March 9, 1950, letters testamentary in his estate were issued to the First National Bank in Sharon, Pa., and C. B. Lartz.[1]

By his will—dated May 14, 1943—the testator gave his entire estate to his executors for the following purposes: (1) to use as much of the income therefrom as might be necessary for the maintenance of his widow, Ella Jones during her lifetime; (2) upon her death, to *deliver* one-half of the estate "to the person or persons to whom she directs by [her will], and in whatever manner or proportion she directs by [her will]; (3) the balance of his estate,[2] he gave to "such of [his] brothers and sisters as I may hereafter name in a codicil or codicils . . .". Testator gave his executors *"full discretionary power"* to select the property to be delivered, to place values upon each item of realty or personalty and to set apart items amounting to one-half the estate for his widow's appointees. Furthermore, the testator empowered both his executors and trustees "during the lifetime of my wife, and while said estate

---

[1] The Bank and Lartz were also named trustees under the will. Lartz died December 9, 1956.

[2] The dispute—now resolved by stipulation of the parties and not before us for determination—whether testator died testate or intestate as to this portion of his estate arose from this language of the will considered in connection with the codicil, infra.

is held in trust" to sell any of his estate and *"invest the proceeds received therefrom"* as they might deem for the best interests of his estate.

On September 22, 1948, testator executed a codicil to his will which purported, inter alia, to execute a power of appointment given testator under the will of his late father, Edward Jones. In this codicil he directed that the income from "one half of the estate owned by my father and myself" should be paid during her lifetime to his sister, Mary Jones Lees, and, upon her death, the principal of the estate should be divided equally between his brother, T. R. Jones, and his sister, Margaret Egan.

Ella Jones died December 26, 1951 and, by her will, appointed her two sisters, Bertha M. Young and Carrie M. Shoemaker, to take the one-half interest under testator's estate.[3]

The executors filed an inventory and appraisement of the estate on May 14, 1951—*approximately fourteen months subsequent to their appointment*—which were both incorrect and incomplete. Two months later the executors filed a so-called "Statement of Assets" which was also incorrect and incomplete. On June 26, 1952 the executors filed two so-called "Supplemental Statements of Assets" which were correct but incomplete.

On March 1, 1954—*nearly four years after the executors' appointment*—Carrie M. Shoemaker and Bertha M. Young petitioned the Orphans' Court of Mercer County for a citation on the executors to show cause why they should not execute the second paragraph of testator's will—i.e., deliver one-half of testator's estate to petitioners as Ella Jones' appointees—and file an account of their administration of this estate. On August 14, 1954, the executors filed a first and final

---

[3] Both sisters are now deceased and their interests are represented by their respective personal representatives.

account and an auditor was then appointed. After hearing, the court below, on December 9, 1955, denied the petition to compel the executors to execute the second paragraph of testator's will, noting in its opinion that an account had then been filed and an auditor appointed. An appeal from this order was taken to this Court and that appeal was quashed on the ground that the order was interlocutory. The auditor filed his report on September 8, 1958 in which he recommended that the executors be surcharged for certain losses and penalties incurred in connection with settlement of the inheritance tax.

Exceptions were filed to the auditor's report by the surviving executor of this estate and the executors of the estates of Carrie M. Shoemaker, Bertha M. Young, T. R. Jones, Margaret Egan and Mary Jones Lees.[4] On March 10, 1959, the Orphans' Court of Mercer County confirmed the auditor's surcharges and, in addition, surcharged the executors for their failure to invest the proceeds derived from the sale of the realty and their failure to deliver one-half of the realty to Ella Jones' appointees. From that decree these four appeals were taken.

In an attempt to clarify a much muddled situation we will treat the surcharges and their factual background separately.

### Inheritance Tax Surcharges

On April 21, 1950 the executors paid $600 on account of inheritance taxes to the Commonwealth. On November 30, 1951—*one year and eight months after testator's death*—the executors filed a Statement of the "Debts and Deductions" claimed for inheritance tax

---

[4] Testator's brothers and sisters and Ella Jones' sisters—the only persons directly interested in the estate—died prior to the filing of the auditor's report.

purposes amounting to $19,298.12. In May, 1952 the executors paid $241.89 on account of the inheritance tax. Prior to July 26, 1952—*two years and four months after testator's death*—the executors filed a report with the inheritance tax authorities listing testator's Pennsylvania assets at the values shown on the inventory and appraisement, as amended by the first "Supplemental Statement of Assets." On July 26, 1952, a *final* tax appraisement was filed by the Commonwealth in the Register of Wills' Office and estate counsel was duly notified of the filing of this appraisement. On September 10, 1952 executors' counsel was again notified not only of the filing but also of the finality of this appraisement. Despite such notice, the executors of the estate took no appeal. On April 5, 1956 the Commonwealth presented a petition in the Orphans' Court of Mercer County to enforce payment of the unpaid inheritance tax. After answer filed on behalf of the estate and hearing, the court granted the Commonwealth's petition and directed payment of the inheritance tax calculated on the basis of the final appraisement of July 26, 1952. An appeal was taken to this Court by the surviving executor and we held that the executors' failure to take and perfect an appeal from the appraisement within the statutory period precluded such appeal: *Jones Estate*, 390 Pa. 599, 136 A. 2d 327.

The surcharges imposed in respect to the inheritance tax fall into four categories: (1) a surcharge of $758.76 for failure to pay the inheritance tax within the statutory period; (2) a surcharge of $603.03 for failure to take an appeal from the Commonwealth's appraisal of July 26, 1952 resulting in a loss to the estate; (3) a surcharge of $394.85, the amount of court costs incurred in *Jones Estate,* supra; (4) a surcharge of $48.81 for failure to request as an additional inherit-

ance tax deduction the amount *actually* required to compromise T. R. Jones' claim against the estate.

The Fiduciaries Act of 1949 (Act of April 18, 1949, P. L. 512, art. IV, §401, 20 PS §320.401) provides: "Within *three* months after his appointment, every personal representative shall file with the register an inventory and appraisement . . . of all real and personal estate of the decedent, except real estate outside of the Commonwealth. . . ." (Emphasis added.) The executors did not file an inventory and appraisement until *fourteen* months after their appointment and no justification for such delay appears of record. The Act of June 20, 1919, P. L. 521, art. II, §15, as amended, 72 PS §2351, provides that every personal representative shall file an inventory or schedule of any property subject to inheritance tax within *three* months after the death of a resident decedent or within *three* months after acquiring such interest in any property subject to the tax. Over *twenty-five months* elapsed before these executors complied with the provisions of this statute and the record reveals no excuse for such inaction. The Act of June 20, 1919, P. L. 521, art. IV, §38, as amended, 72 PS §2442, provides: "If the [inheritance] tax is not paid at the end of one year from the death of the decedent, interest shall be charged at the rate of six per centum per annum on such tax." *Griffith's Estate,* 96 Pa. Superior Ct. 242, 246, 247, illustrates the principle that a personal representative, in the absence of proper evidence excusing his negligence, is subject to surcharge in the amount of the penalty imposed by reason of delay in paying a transfer inheritance tax.[5] When finally ascertained the tax in

---

[5] The Superior Court stated (p. 247) : "We see no reason why he should not be required to pay the whole amount. Common prudence would dictate that the tax should have been paid promptly. It was incumbent upon the accountant to present evidence to excuse his negligence. The reasons he gave are not sufficient."

this estate was $3,016.84; the executors' own evidence shows on December 30, 1950 a principal balance in the estate amounting to $13,163.60—more than sufficient to pay the amount of the tax. Failure to pay this tax on time is indefensible. The last installment on the tax was not paid until January 8, 1958—*nearly eight years after decedent's death and nearly seven years after the time the tax was due.* The penalty from March 4, 1951—when the tax should have been paid— until January 8, 1958—when the last installment of the tax was finally paid—was $758.76, an amount which the executors paid out of the estate funds. This penalty was incurred by inexcusable negligence on the executors' part and the surcharge of $758.76 is sustained.

As above stated, on July 26, 1952 the inheritance tax authorities made a final appraisement of the estate assets and due notification of the amount and finality of such appraisement was given to estate counsel. By that time five parcels of land had been sold by the executors for $10,250 less than the evaluation of such realty by the Commonwealth.[6] Despite knowledge of such overvaluation of the realty by the Commonwealth the executors took no appeal from the final appraisement and lost their right to question this overvaluation. Through the executors' negligence in this respect the estate suffered a loss in the amount of $603.03. The surcharge imposed on the executors in this amount is sustained.

The court below imposed a surcharge in the amount of $394.85, the court costs involved in litigating the executors' failure to appeal within the statutory period from the final tax appraisement. We have re-examined the record in *Jones Estate,* supra, together with the

---

[6] The other parcels of realty were sold, subsequent to the appraisement, for $199.35 more than the Commonwealth's appraised value.

present record. No reason appears for the surviving executors' failure to appeal within the statutory period; once having failed to appeal, to litigate was to compound the error and the estate should not be subjected to payment of these costs. The surcharge in the amount of $394.85 is sustained.

When testator died, his brother, T. R. Jones, held three unpaid notes which bore a face value of $2200 upon which he claimed unpaid interest of $4500. When the executors filed their Statement of Debts and Deductions they claimed as a tax deduction $2200 as the amount necessary to settle this claim. The claim was finally settled in September, 1951, for $3,013.50. Even though the tax had not then been settled and determined, the executors made no effort whatsoever to claim as an allowable deduction $3,013.50, instead of $2200. As a result the estate lost a credit by way of deduction of $813.50—the difference between $3,013.50 and $2200—and sustained a tax loss of $48.81 through the executors' negligence. The surcharge in this amount is affirmed.

### Surcharge For Failure To Invest Estate Funds

The duties of these executors and the orbit of their authority arose from two sources: the provisions of the will and the statutes which deal generally with the duties of personal representatives.

It is evident from an examination of the instant will that the primary object of testator's bounty was his wife, Ella Jones. To her he gave the "income" from his estate to the extent that such "income" might be necessary for her "maintenance"; at the same time he envisaged that such "income" might be more than sufficient for her "maintenance", in which event any balance of "income" was to liquidate any indebtedness owed at the time of his death. So long as Ella Jones

lived testator contemplated that the Bank and Lartz would act in dual capacities, as executors *and* as trustees; the testamentary phrases "during the lifetime of my wife" and "while said estate is held in trust" were used synonymously and, during this period, certain authority was expressly granted the Bank and Lartz as executors and trustees. Even the most cursory reading of the third paragraph of the will which empowered the Bank and Lartz, in their dual capacities, to "sell any of [his estate]" indicates that the testator intended, at least during Ella Jones' lifetime, that the proceeds of any such sale or sales should be invested and the funds not permitted to remain idle. Whether the word "empower" be construed as a "direction" or simply as an "authorization", it is clear that testator intended that any funds realized from a conversion of his assets, at least during this period of time, be invested for the purpose of insuring the necessary income to his widow and of liquidating any indebtedness owed at the time of his death.

Bearing in mind the clear import of the testamentary language, the actions of the executors are difficult to understand. Within five months of their appointment, the executors sold six parcels of realty in which testator had an interest, either in whole or in part, for $23,150 and yet none of the proceeds of such sales were invested until almost five years thereafter. For permitting such funds to remain unproductive no plausible reason appears of record.

Testator's plan for the disposition of his estate *after* his widow's death is manifest from the will; an equal distribution of his estate between his widow's family and his own family. Testator left to his widow the selection of those persons who were to share one-half of his estate; he retained to himself the right to select which of his brothers and sisters were to share the

other one-half of the estate. He contemplated that, upon his widow's death, his estate would be distributed equally between the two classes of persons within a reasonable time.

Having designated the quantum of his estate subject to his widow's appointment of the beneficiaries, he then outlined an expeditious method for allocating such quantum to the designated beneficiaries. Testator gave to the Bank and Lartz, as executors, *"full discretionary power"* to evaluate the various items which then comprised his estate and to determine what property, whether real, personal or mixed, should constitute the one-half to be set apart to his widow's appointees. The executors' powers were plenary; to them—not to any auditor or any court—testator entrusted the selection of the assets which were to constitute the one-half of the estate to belong to his widow's appointees. Once having made that selection, the executors were under the express duty "to deliver" to the wife's appointees the items constituting such one-half of the estate.

On the event of Ella M. Jones' death, instead of evaluating the items which constituted the then estate with the view of a prompt selection and delivery of one-half thereof to the two appointees, the executors ignored the testamentary instructions and proceeded to convert the assets into cash. Between September 1952 and December 1953, the executors sold all the remaining parcels of realty, both within and without the Commonwealth,[7] *and distributed nothing to Ella Jones' appointees.* Despite repeated demands by these two appointees, the executors did nothing to carry out the explicit testamentary directions. Not even an

---

[7] The six parcels of land which the executors sold during the life tenancy were then yielding rents of $2070 per year, a gross return of 12¼%. The four parcels of land sold after the termination of the life tenancy yielded an annual rental of $4116, a gross return of 13%.

account was filed of their administration of this estate until the two appointees sought the aid of the court to require such accounting and when the account was finally filed it was not only incorrect but incomplete.

In attempted justification of their positions the executors assign certain reasons. In the first place, the executors contend that, because of the provisions of the second paragraph of testator's will and the codicil to the will, they were uncertain whether testator had died testate or intestate as to the balance of his estate; until that question was determined, the executors argue, they were unable to carry out the provisions of the will as to the widow's appointees. Such a position is untenable. Assuming, arguendo, the existence of such question, the pendency thereof should not have prevented the executors from performing their duties. Had the executors filed even a partial account within a reasonable time after Ella Jones' death the court could have determined whether testator died testate or intestate. Moreover, by resort to a declaratory judgment proceeding, the executors could have secured a court construction of the terms of both the will and the codicil. Under Section 2 of the Declaratory Judgment Act (Act of June 18, 1923, P.L. 840, §2, 12 PS §832) : "Any person interested under a . . . will . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status or other legal relations thereunder." See *Lifter Estate,* 377 Pa. 227, 228, 229, 103 A. 2d 670.

In the second place, the executors urge the difficulty they encountered in connection with four claims against the estate. Suffice it to state in this respect that these claims and their validity could have been promptly and timely adjudicated had the executors filed even a partial accounting. Existence of these claims furnished

no reason under the circumstances for the executor's inaction.

In the third place, the executors point out the difficulty they experienced in straightening out several of the titles to the realty, all of which rendered difficult the appraisal of the value of such realty. The court below aptly disposed of this excuse: "The difficulties in appraising these properties were not substantial."

Our independent examination of this record reveals absolutely no justification for the inaction and delay of the executors in carrying out the provisions of this will. On the other hand, the executors never invested any of the proceeds of the sales of realty or any of the cash in the estate until July 22, 1955, *over five years after their appointment.* What is most reprehensible is that during this five year period the estate funds were carried in non-interest bearing accounts in the commercial department of the corporate executor and utilized by the corporate executor for its own loan business and to its own profit while the beneficiaries of this estate received absolutely nothing from the estate.[8]

Such self-dealing on the part of the corporate executor over a period of five years and such conduct on the part of both executors is sought to be justified on the basis of two legislative enactments, the Banking Code of 1933, as amended,[9] and Section 506 of the Fiduciaries Act of 1949.[10]

---

[8] The court adopted the auditor's finding that: "The Executors had $15,365.22 in cash at the end of 1950; $12,364.53 in cash at the end of 1951; $15,912.07 in cash at the end of 1952; $27,221.36 in cash at the end of 1953; and $40,794.61 in cash at the end of 1954. Not until July, 1955, did the Executors invest any of the estate funds. At that time the Executors invested $31,000.00 in U. S. government bonds, which left $9,000 uninvested."

[9] Act of May 15, 1933 P.L. 624, art. XI, §1108; Act of July 2, 1935, P.L. 521, §1; Act of April 11, 1945, P.L. 208, 7 PS §819-1108.

[10] Act of April 18, 1949, P.L. 512, art. V, §506, 20 PS §320.506.

Section 4 of the Banking Code, supra, provides that a bank and trust company may use funds, *awaiting investment or distribution,* in the conduct of its business provided that it pledge or hypothecate with the trust department of the bank certain specified types of bonds or obligations. In accordance with this statutory provision the corporate executor did pledge the requisite bonds in connection with the use of these estate funds in its commercial department. Furthermore, under the statute and decisional law (*Kaufmann's Estate,* 137 Pa. Superior Ct. 88, 93, 94, 8 A. 2d 472) the payment of interest on a demand deposit by the corporate executor would have been contrary to public policy. Technically, therefore, the corporate executor was within its statutory right in using the estate funds in its commercial department. However, such statutory provisions cannot act as a cloak of immunity for the executors under the instant factual situation. When the legislature contemplated the employment of estate funds by a bank and trust company in its commercial department, such employment was clearly to be temporary in nature; the statutory description of the funds which may be so utilized are funds awaiting "investment or distribution". We find no legislative intent expressed in the Banking Code authorizing the use of such funds on a long term basis; such a construction would be both absurd and unreasonable. Cf: Statutory Construction Act of 1937, Act of May 28, 1937, P.L. 1019, art. IV, Sec. 52(1), 46 PS §552. In the instant situation, the corporate executor by the use of the estate funds realized an average yield for its own purposes of *4.6%-5.2% over a period of almost five years.* The Banking Code was never intended to sanction this type of corporate banking conduct.

Section 506 of the Fiduciaries Act of 1949, supra, relied on by the executors, provides: "Subject to his duty

to liquidate the estate for prompt distribution and to the provision of the will, if any, the personal representative may invest the funds of the estate but shall have no duty to do so." Such a provision was without previous statutory precedent and "Existing case law [had] approved investment of funds by personal representatives and indicates that there is a duty to invest in certain circumstances: Cf: Kohler Estate, 33 A. 2d 920, 348 Pa. 55." Comment, Commission. The executors interpret this statute to mean that under no circumstances is there a duty on a personal representative to employ estate funds so as to secure profit for the estate and they find therein a legislative sanction for allowing estate funds to remain unproductive no matter how long eventual settlement of the estate be delayed. Such a view is certainly at variance with common sense and with the case law prior to the enactment of the 1949 Act: *Landis v. Scott*, 8 Casey 495: *Bruner's Appeal*, 57 Pa. 46; *Robinett's Appeal*, 12 Casey 174; *Lloyd's Estate*, 82 Pa. 143; *Sproul's Appeal*, 105 Pa. 442. In *Kohler's Estate*, 348 Pa. 55, 57, 33 A. 2d 920, we stated: "The duty of an executor generally is not to retain and invest, but to liquidate and terminate: Restatement, Trusts, section 6. If, however, a valid reason exists for the retention of a fund by the executor, it is encumbent upon him not to permit such funds to remain idle, but to invest it, and if there is a default in this regard he is chargeable with lawful interest thereon: [citing cases]." However, whether the statute is to be interpreted as urged by executors or not is of no moment in the instant situation. While the court below did surcharge these executors for a failure to invest, a sounder ground for the imposition of such surcharge exists.

These executors, by their acts of commission and omission, delayed and postponed settlement of this

estate so that, for a period of at least five years, funds, which could and should have been distributed to the beneficiaries by whom the funds could have been made productive, were allowed to remain idle and unproductive. Particularly is this made evident by the fact that the executors converted extremely productive realty into non-productive cash, thus during the period pending final distribution depriving the beneficiaries of income to which they were entitled. The executors deprived the beneficiaries of estate assets which were productive and at the same time withheld distribution of the cash assets of the estate which the beneficiaries might have made productive. Regardless of a duty or lack of duty to invest estate funds on the part of these executors after the death of the life tenant, even when they had testamentary authority to invest, during the lifetime of the life tenant, they chose not to do so. The executors were gravely at fault and oblivious of the responsibility of their stewardship in the manner in which they administered this estate; through their action and inaction they permitted a status to continue where moneys rightfully due for distribution to the beneficiaries were allowed to remain in an unproductive state, while the corporate executor was permitted to employ such moneys for its own profits. The Fiduciaries Act, supra, cannot excuse their actions in this respect even if it be interpreted under these circumstances as absolving them from a *duty* to invest.

Whether we term the gift to Ella Jones' appointees as a specific or a general legacy, whether the executors did or did not have the power to sell testator's realty after the death of the life tenant, we need not, under the circumstances herein presented, determine, in order to surcharge these executors. From the inception of their stewardship of this estate these executors ignored not only the provisions of the will, but the ordinary rules

of conduct which should govern all fiduciaries. They ignored the testamentary intent that the proceeds of sales of any estate assets during Ella M. Jones' lifetime be invested; upon Ella Jones' death, they ignored the express direction of the testator that they evaluate the estate assets, select those items which constituted one-half of the estate and deliver such one-half of the assets to Ella Jones' two appointees; until forced by legal action, they filed no accounting, and a correct and complete accounting was not made until almost eight years after the testator's death; they paid, in contravention of the provisions of the will, principal to the life tenant and, after her death, even her funeral expenses, all to the prejudice of the remainderman; they ignored the demands of the two aged appointees of life tenant that they perform their duties under the will; they allowed estate funds to remain an unconscionable length of time in a non-productive state while the funds provided a source of income to the corporate executor; they attempted to delegate to the auditor, once an account had been filed, the discretionary power to determine the share to which the life tenant's appointees were entitled even though the testator had imposed such discretion in them alone.

The tragic effect of their mismanagement of this estate is evident. Every person directly in interest in this estate has died without receiving the share, or any part thereof, to which he or she was entitled after the death of Ella Jones. The testamentary plans of both testator and his widow have been completely thwarted by the inexcusable inaction and negligence of the executors. The surcharges complained of by the executors in their appeal were fully justified under the circumstances and the action of the court below in imposing such surcharge was eminently proper.

The surcharge imposed by the court below upon the executors for their failure to invest the estate funds was at the rate of 3% per annum on such uninvested funds during the period they remained unproductive. The personal representatives of the two deceased appointees under the will of Ella M. Jones have appealed on three grounds: (1) that the surcharge should be at the rate of 6% per annum rather than 3% per annum; (2) the executors' commission, originally estimated for inheritance tax purposes at $2750, would be confined to that amount rather than a commission allowed at $4500, as requested and allowed by the court below; (3) the counsel fee of Brockway and Brockway originally estimated for inheritance tax purposes at $1200 but now claimed in the amount of $3200 should be fixed at $2200.

An allowance must be made to the beneficiaries of this estate by way of compensaton for the loss sustained by them through the delay in the settlement of this estate. To this end the court below allowed them interest for the period during which the estate funds were permitted to remain unproductive and set such interest at 3% per annum. Such an allowance is "not as interest eo nomine but by way of damages": *Kenin's Trust Estate (No. 1)*, 343 Pa. 549, 566, 23 A. 2d 837. In our opinion the amount set by the court below was insufficient. Under the present aggravated circumstances the surcharge imposed in this instance at 3% per annum should be increased to 6% per annum (*Lewis Estate*, 349 Pa. 455, 37 A. 2d 559; *Stirling's Estate*, 342 Pa. 497, 21 A. 2d 72) and, thus increased, the surcharge is affirmed.

The fixing of a personal representative's commission is a matter within the province of the Orphans' Court, usually in a better position than this Court to pass upon the reasonableness of the commission charged. Unless the court's discretion has been abused,

the determination of the Orphans' Court should stand: *Strickler Estate,* 354 Pa. 276, 47 A. 2d 134; *Faust Estate,* 364 Pa. 529, 73 A. 2d 369; *Bennett Estate,* 366 Pa. 232, 77 A. 2d 607. The court below approved commissions for these executors in the amount of $4500. On occasion we have disallowed any commission for fiduciaries who have been guilty of supine negligence (*Kline's Estate,* 280 Pa. 41, 49, 124 A. 280), of faithlessness and mismanagement (*Weinstein v. Union Trust Co. of Pittsburgh,* 313 Pa. 280, 284, 169 A. 101), of repeated failures to perform fiduciary duties (*Commonwealth Trust Company Case,* 331 Pa. 569, 582, 1 A. 2d 662), of negligence (*Lewis Estate,* 349 Pa. 455, 461, 462, 37 A. 2d 559). While we might have reached a different conclusion than the court below in the allowance of *any* commissions, yet we are not prepared to overrule the court's exercise of its discretion in this instance. See: *Landis Trust,* 382 Pa. 486, 506, 507, 115 A. 2d 167.

Counsel fee estimated for inheritance tax purposes was $1200. Claim was made before the auditor and the court below for an additional $2000 arrived at in the following manner: (1) $1000 in connection with representation of the estate when a rule was requested that the executors execute the second paragraph of the will, litigation which ended favorably to the estate; (2) $1000 in connection with the litigation involved in *Jones Estate,* supra. The court below allowed an additional $1000 in connection with the first, but denied additional compensation in connection with the second litigation. With that ruling we are in accord.

Decree, as modified, affirmed. The matter is remanded to the court below for disposition in accordance with the views expressed in this opinion. Costs upon the First National Bank in Sharon, the surviving co-executor.