Lare Estate.

Argued April 24, 1969.  Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Jack W. Plowman,* with him *Plowman and Spiegel,* for appellant.

*David McNeil Olds,* with him *John D. McIntyre, A. M. Wiggins, Jr., Richard B. Tucker, Jr.,* and *Reed, Smith, Shaw & McClay,* and *Patterson, Crawford, Arensberg & Dunn,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, October 9, 1969:

This appeal has been taken by Marcellus R. Lare, Jr., surviving spouse and sole legatee of Gertrude K. Lare, deceased, from a Decree of the Orphans' Court of Allegheny County confirming the administrator's account filed by the Pittsburgh National Bank* (formerly Fidelity Trust Company).

The will and the facts and circumstances are unusual and have resulted in extensive litigation since the death of the testatrix in 1942. Gertrude's will was written on a blank check.

Our first encounter with this estate arose from an appeal by the present appellant from a Decree of the Orphans' Court which set aside the will of his wife as a forgery and removed the appellant as administrator c.t.a. We reversed the Orphans' Court on the question of forgery and directed that an issue devisavit vel non be awarded to the appellant: *Lare Will,* 352 Pa. 323, 42 A. 2d 801. No trial was ever held on that issue. Subsequent to our decision, the Bank was appointed administrator de bonis non, although that part of the lower Court's Decree removing appellant as administrator c.t.a. was not disturbed by us. The Bank

_____

* Hereinafter referred to as the Bank.

then procured a citation directing the appellant Lare to file an inventory and account, and, after filing and audit, this appellant was surcharged over $9,000. The assets to which the Bank became entitled as administrator approximated $75,000, including the surcharge.

The Bank thereafter filed a first and partial administrator's account covering its administration from January 6, 1944 to October 28, 1949. Lare (the present appellant) filed objections to this account, principally with respect to (a) items of credit taken by the Bank as compensation for its services and (b) counsel fees. The objections were dismissed, the account confirmed, and another appeal was taken to this Court. We modified the Orphans' Court Decree in that case by disallowing the administrator's claim for compensation based on principal, on the ground that such claim was premature until the final account: *Lare Estate,* 368 Pa. 570, 84 A. 2d 334.

Subsequently, the Bank filed a second and partial account covering its administration from the time of the first accounting up to October 28, 1958. Lare filed exceptions to this account, but because of his ill health and because of efforts that were constantly being made to amicably resolve all differences among the interested parties in the will contest, the exceptions were never argued. Upon petition of the parties, the account and the exceptions were withdrawn in January 1963. It appears now that the will contest has finally been brought to a mutually agreeable settlement, with the will of Gertrude K. Lare having been restored to probate. The Bank has filed a final account covering its administration from the date of its first account to February 26, 1964. This was supplemented to April 13, 1964.

The Bank's final account shows that it collected during the course of its administration approximately $370,000 of income. This consisted principally of divi-

dends on the major holding of the estate—United Pocahontas Coal Company stock. In view of the fact that Lare would have been entitled to a portion of the estate regardless of the outcome of the will contest, the Bank regularly distributed to Lare approximately one-half of the cash income. These distributions or payments totaled in excess of $177,000 up to and including 1963. However, the remaining funds were deposited in a *non-interest-bearing account with the Bank;* and during its administration the Bank held *uninvested* funds of the estate, on which it paid no interest, in the amounts set forth in the following table:

| Date | Principal | Income |
|---|---|---|
| 7/1/44 | $13,359.18 | $ 1,940.22 |
| 1/1/45 | 9,693.57 | 4,254.26 |
| 7/1/45 | 8,855.32 | 5,098.72 |
| 1/1/46 | 7,820.82 | 6,944.60 |
| 7/1/46 | 7,818.02 | 7,056.28 |
| 1/1/47 | 7,812.78 | 11,102.87 |
| 7/1/47 | 7,769.28 | 10,413.67 |
| 1/1/48 | 10,818.29 | 19,260.78 |
| 7/1/48 | 12,318.29 | 17,371.84 |
| 1/1/49 | 12,318.29 | 37,947.70 |
| 7/1/49 | 14,282.68 | 39,366.63 |
| 1/1/50 | .25 | 41,024.75 |
| 7/1/50 | 12,500.00 | 39,564.75 |
| 1/1/51 | 12,500.00 | 51,159.70 |
| 7/1/51 | 12,500.00 | 51,553.57 |
| 1/1/52 | 3,607.04 | 57,602.72 |
| 7/1/52 | 3,720.40 | 58,072.82 |
| 1/1/53 | 2,793.10 | 67,359.00 |
| 7/1/53 | 4,043.00 | 66,310.41 |
| 1/1/54 | 4,043.00 | 71,538.55 |
| 7/1/54 | 46.63 | 75,218.91 |
| 1/1/55 | 3,842.03 | 76,963.59 |
| 7/1/55 | 3,842.79 | 78,696.45 |

| Date | Principal | Income |
|---|---|---|
| 1/1/56 | 3,842.79 | 82,097.13 |
| 7/1/56 | 3,842.79 | 81,637.59 |
| 1/1/57 | 3,902.79 | 90,079.06 |
| 7/1/57 | 1,402.79 | 87,881.20 |
| 1/1/58 | 1,402.79 | 98,554.79 |
| 7/1/58 | 1,291.12 | 96,692.63 |
| 1/1/59 | 90.87 | 98,165.02 |
| 7/1/59 | 236.87 | 105,461.70 |
| 1/1/60 | 236.87 | 111,967.30 |
| 7/1/60 | 236.87 | 115,806.14 |
| 1/1/61 | 36.87 | 112,037.44 |
| 7/1/61 | 36.87 | 118,056.17 |
| 1/1/62 | 36.87 | 121,202.10 |
| 7/1/62 | 36.87 | 123,878.33 |
| 1/1/63 | 53.42 | 125,418.07 |
| 7/1/63 | 44.92 | 117,702.86 |
| 1/1/64 | 51.75 | 126,756.90 |
| 7/1/64 | 19,156.51 | 26,676.66 |

Because of these uninvested cash balances, Lare, in propria persona, filed, on April 3, 1964, a document in the proceedings entitled "Exceptions to Account."

A stipulation of facts entered into between Lare, the Bank and its counsel states that the issues raised by the exceptions to the account are the following: "(a) Is the Bank liable for a surcharge for not investing the accumulated principal and/or income cash? (b) Is the Bank liable for a surcharge for holding the accumulated principal and/or income cash in the separate non-interest bearing commercial banking account in its Commercial Department, the funds of which were available,* subject to certain restrictions imposed by law, for use by the Commercial Department? (c) Did the Bank, by reason of its handling

---

* No findings or agreements were made with respect to the amount of return realized by the Bank's commercial department on these available funds.

of the accumulated principal and income cash, forfeit its right to principal and/or income compensation? Only the propriety, not the amount, of this compensation is in issue, except that, should the Court determine that the value of the estate is less than the value estimated by the Bank as set forth in paragraph 6, the reasonableness of the amount of the compensation is also in issue. (d) Did Reed, Smith, Shaw & McClay, by reason of their representation of both the Bank as administrator and the will contestants, forfeit their right to compensation for services rendered to the Bank as administrator? Only the propriety, not the amount, of this compensation is in issue."

These questions, under the unusual facts of this case, raise difficult and perplexing issues.

After a hearing, the Orphans' Court dismissed appellant's exceptions, confirmed the account nisi and made an award out of the estate to the Bank of approximately $28,000 to cover the Bank's costs in defending against the appellant's exceptions. In other words, the Orphans' Court decided all of the issues in favor of the Bank. Lare's exceptions to the Court's Decree were dismissed by the Orphans' Court; whereupon Lare took this appeal.

The most important questions arise under (a) and (b), above. In the absence of exceptional circumstances, the Bank undoubtedly breached its duty when it failed to invest the cash which it possessed and had accumulated over a period of twenty years. A number of contentions are made by the Bank to support its position that no such duty existed in this case.

Primarily, the Bank contends that the basic duty of a personal representative is to collect the assets of a decedent and convert them into proper form for distribution to creditors and beneficiaries. For this proposition the Bank cites *Wallis Estate,* 421 Pa. 104, 218 A. 2d 732, in which we stated (page 112) that the

executor's "primary duty was to marshal the assets and to liquidate and terminate as soon as possible." In further support of this contention, the Bank relies on Sections 44(a) and 44(b) of the Fiduciaries Act of 1917*, P.L. 447, 20 P.S. ch. 3, app. §§811, 812, which provided as follows: "No executor or administrator shall be liable to pay interest but for the surplusage of the estate remaining in his hands or power when his accounts are *or ought to be filed:* \*\* *Provided,* That nothing herein contained shall be construed to exempt an executor or administrator from liability to pay interest, *where he may have made use of the funds of the estate for his own purposes.*

"The amount of interest to be paid in all cases by fiduciaries shall be determined by the orphans' court, under all the circumstances of the case, but shall not, in any instance, exceed the legal rate of interest for the time being."

In further support of this position, the Bank contends that in the absence of (a) delay in distribution caused by the personal representative or (b) self-dealing, there was no obligation on the Bank to invest the cash balances. There is no merit in these contentions.

The Bank next urges that if any duty to invest existed, it did not apply to *cash* received as *income,* as this would amount to the compounding of income. Moreover, the Bank states that the issue is res adjudicata up to and through 1949 because of the prior confirmation of the Bank's first and partial account. This question was never raised in or decided by the Court in that accounting, but we believe it is now barred

---

\* The Fiduciaries Act of 1917 governs, in view of the fact that the death of Gertrude K. Lare in 1942 preceded the adoption of the Fiduciaries Act of 1949.

\*\* Italics throughout, ours, unless otherwise noted.

by appellant's failure to object to the accounting and the Court's confirmation of the account.

Finally, the Bank strongly contends that its true status was administrator pendente lite, rather than its official designation of administrator d.b.n., and as such the Bank was merely a stakeholder with no duty, nor indeed any power, to make investments. In support of this contention that its status was that of administrator pendente lite, the Bank cites the footnote which appears in this Court's Opinion in *Lare Estate,* 368 Pa., supra, which reads as follows (page 572): "While the Trust Company was so designated in its appointment, the designation should have been 'pendente lite,' such appointment being authorized by Section 4 of the Fiduciaries Act of 1917, P.L. 447, 20 P.S. ch. 3, app. 354. Such an administrator is virtually a custodian of the decedent's assets pending the will contest and endures only until the termination thereof. For powers and duties see Katz's Estate, 49 D. & C. 215 (1944)." Moreover, the Bank further states that it acted in reliance on the advice of counsel that as administrator pendente lite it did not have the power to make investments. We find no merit in either of these contentions, although the general rule is that reliance upon the advice of counsel would legally excuse a client's unjustifiable actions. *Kohler Estate,* 348 Pa. 55, 58, 33 A. 2d 920; *Dempster's Estate,* 308 Pa. 153, 162 Atl. 447.

In spite of our careful and thorough consideration of all the technical and legalistic points ably presented by the Bank, we invariably return to an overall consideration of the situation, which is simply that a professional fiduciary has permitted substantial sums of cash to lie idle over a twenty-year period, with the resultant inexcusable loss to this appellant. In our judgment, this was improper and legally inexcusable, regardless of the technical designation of the admin-

istrator and whether the cash represented income or principal, and whether the delay in distribution was the fault of the fiduciary or of counsel for the Bank, or of the legatee. Such action, or rather lack of it, was not the exercise of common skill, common prudence and caution which is the basic standard and requirement for every fiduciary: *Maurice Estate,* 433 Pa. 103, 249 A. 2d 334; *Jones Estate,* 400 Pa. 545, 162 A. 2d 408; and, in our opinion, the testamentary legatee should not be required to bear the loss of such unjustifiable fiduciary conduct.

In *Jones Estate,* 400 Pa., supra, the executors had failed to invest cash proceeds of a decedent's estate *for a period of almost five years.* There, as here, the executors relied on a literal construction of the Fiduciaries Act of 1949, which was the governing statutory law in that case. As this Court said (pages 559-560) : "Section 4 of the Banking Code, supra, provides that a bank and trust company may use funds, *awaiting investment or distribution,** in the conduct of its business provided that it pledge or hypothecate with the trust department of the bank certain specified types of bonds or obligations. In accordance with this statutory provision the corporate executor did pledge the requisite bonds in connection with the use of these estate funds in its commercial department. Furthermore, under the statute and decisional law (Kaufmann's Estate, 137 Pa. Superior Ct. 88, 93, 94, 8 A. 2d 472) the payment of interest on a demand deposit by the corporate executor would have been contrary to public policy. Technically, therefore, the corporate executor was within its statutory right in using the estate funds in its commercial department. However, such statutory provisions cannot act *as a cloak of immunity* for the executors under the instant factual

---

* Italics in *Jones Estate* Opinion.

situation. When the legislature contemplated the employment of estate funds by a bank and trust company in its commercial department, *such employment was clearly to be temporary in nature;* the statutory description of the funds which may be so utilized are *funds awaiting 'investment or distribution'.* We find no legislative intent expressed in the Banking Code authorizing the use of such funds on a long term basis; such a construction would be both absurd and unreasonable. Cf: Statutory Construction Act of 1937, Act of May 28, 1937, P. L. 1019, art. IV, Sec. 52(1), 46 PS §552. In the instant situation, the corporate executor by the use of the estate funds realized an average yield for its own purposes of 4.6%-5.2% *over a period of almost five years.\** The Banking Code was never intended to sanction this type of corporate banking conduct.

"Section 506 of the Fiduciaries Act of 1949, supra, relied on by the executors, provides: 'Subject to his duty to liquidate the estate for prompt distribution and to the provision of the will, if any, the personal representative may invest the funds of the estate but shall have no duty to do so.' Such a provision was without previous statutory precedent and 'Existing case law [had] approved investment of funds by personal representatives and indicates that there is a duty to invest in certain circumstances: Cf: Kohler Estate, 33 A. 2d 920, 348 Pa. 55.' Comment, Commission. The executors interpret this statute to mean that *under no circumstances* is there a duty on a personal representative to employ estate funds so as to secure profit for the estate and they find therein a legislative sanction for allowing estate funds to remain unproductive no matter how long eventual settlement of the estate be delayed. Such a view is certainly at

---

\* Italics in *Jones Estate* Opinion.

variance with common sense and with the case law prior to the enactment of the 1949 Act: Landis v. Scott, 8 Casey 495: Bruner's Appeal, 57 Pa. 46; Robinett's Appeal, 12 Casey 174; Lloyd's Estate, 82 Pa. 143; Sproul's Appeal, 105 Pa. 442. In Kohler's Estate, 348 Pa. 55, 57, 33 A. 2d 920, we stated: 'The duty of an executor generally is not to retain and invest, but to liquidate and terminate: Restatement, Trusts, section 6. If, however, a valid reason exists for the retention of a fund by the executor, it is encumbent upon him not to permit such funds to remain idle, but to invest it, and if there is a default in this regard he is chargeable with lawful interest thereon: [citing cases].' "

See, to the same effect, *Reid v. Reid,* 237 Pa. 176, 85 Atl. 85, where we required a corporate fiduciary to pay the same interest on its trust account deposits which it would pay to a third party who made similar deposits with the bank. *Stahl v. First Pa. Bank & Trust Co.,* 411 Pa. 121, 191 A. 2d 386, upon which the Bank relies, is clearly distinguishable.

In view of the above cited and quoted authorities, we hold that the Bank acted improperly and negligently in failing to invest the cash balances of the estate, and it must be surcharged for such failure.

The Bank further contends that it could not be blamed for the fact that distribution of this estate was delayed for over twenty years or surcharged for interest during this period. Lare was undoubtedly partially responsible for the delay because of his inability or unwillingness to proceed with the trial of the issues in the will contest. However, it is clear that the Bank was fully aware of the delays which were occurring and could and should have reasonably foreseen that the administration would have been protracted. Under these circumstances, the Bank should have invested the idle cash or requested the Orphans' Court by petition or accounting to determine its investment responsibili-

ties and duties, rather than permit the funds to lie fallow for such a long period of time.

Both the Bank and the Orphans' Court stressed the role of the Bank as a stakeholder pending the resolution of the will contest. In this regard, the Orphans' Court was of the opinion that the litigation could have been quickly settled by an agreement of the litigants, in which event the Bank would and should have been prepared to make immediate disposition of the estate's funds. The Orphans' Court concluded that the mere passage of time does not convert a passive stakeholder into an active fiduciary. This conclusion is contrary to the decisions of this Court, which cover a period of more than one hundred years.

In *Biles's Appeal,* 24 Pa. 335, the Court dealt with the question of retaining uninvested sums over an extended period of time. In that case, the Court said (page 337): "Executors and administrators are generally bound to pay interest on the money which they keep for a considerable time after the expiration of one year from the decedent's death. This is particularly true of a balance on a partial account, which is retained in the hands of the accountants until a final settlement.

"There is nothing to take this case out of the rule. Keeping the money unused, or depositing it in a bank, where it produced nothing, will not relieve the appellants. They might have paid it to the legatees or invested it. It is not proved that they were liable to be called on for it so suddenly that it was necessary to keep it where it could be drawn for."

In *Bruner's Appeal,* 57 Pa. 46, the Court said (page 52): "But it by no means follows that an executor may suffer so large a balance as $6,754 to lie in his hands totally unproductive for five years: Yundt's Appeal, 1 Harris 575. It was his duty to invest it, or at least to have prayed the direction of the Orphans'

Court upon the subject while the litigation was pending."

In *Lloyd's Estate,* 82 Pa. 143, the Court said (page 148) : "It is not conceivable that a business man of average sagacity, owning such an estate in his own right, under the circumstances disclosed, would have so managed it as to render it for five years utterly unproductive."

In *Kohler Estate,* 348 Pa., supra, the Court said (page 57) : "If, however, a valid reason exists for the retention of a fund by the executor, it is incumbent upon him not to permit such fund to remain idle, but to invest it, and if there is a default in this regard he is chargeable with lawful interest thereon: [cases cited]."

The Bank notes that its first and partial account, which covered its administration up to 1949, was confirmed on appeal by this Court and contends that such confirmation is res adjudicata as to all items contained therein as well as to all questions which could have been raised concerning such items. We agree with this contention, and we hold that the appellant is barred from going behind or beyond the final Decree in the 1949 accounting as to the administration of the estate for the period covered in that account. We further hold that the appellant is also barred from attacking at this time the alleged impropriety and unlawfulness of the services of the law firm of Reed, Smith, Shaw & McClay during the period covered by that account. That issue was before this Court in *Lare Estate,* 368 Pa., supra. Although we did not *explicitly* discuss that question in our Opinion, we nevertheless approved the payment of counsel fees to that law firm, in spite of appellant's challenge of its actions and its compensation.

Appellant also contends that the Bank should not be entitled to *any* compensation because of its breach

of duty to invest the accumulated cash and its action in depositing such cash in its own commercial department for use by the Bank. Appellant does not question the fact that the Bank has rendered services which would have *otherwise* entitled it to substantial compensation. Furthermore, in view of the Bank's reliance on the advice of counsel, we cannot say that the Bank acted in bad faith, or that the Orphans' Court abused its discretion in granting reasonable compensation to the Bank; consequently, we affirm that part of the lower Court's Decree.

The award of counsel fees or compensation to attorneys for the Bank, payable by this estate, for their services rendered to the Bank in its defense to appellant's claims is disallowed.*

Appellant must be paid reasonable interest not exceeding 6% for the loss sustained by him as a result of the failure of the Bank to invest the substantial cash balances which it held since the period of accounting in 1949. Accordingly, we remand this case to the Orphans' Court with directions to impose a surcharge for those estate funds which were *unreasonably* permitted to remain unproductive since the Bank's accounting in 1949.

Decree modified; Bank to pay costs.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I fully agree with the majority's decision to hold this professional corporate fiduciary liable for breaching its fiduciary duties. I must, however, dissent from the limitation which the majority places on the extent of the bank's liability. I cannot agree that principles of res judicata bar surcharge for the period of 1944

———

* This does not prevent the attorneys from being paid reasonable counsel fees by the Bank for services rendered to it.

to 1949. Nor can I agree that the rate of surcharge must be fixed at six percent per annum.

I start with two settled propositions. An account of a fiduciary, confirmed by the court, is only conclusive as to what it contains. See *Alpern v. Girard Trust Corn Exchange Bank,* 403 Pa. 391, 399, 170 A. 2d 87, 91 (1961); *Shindel's Appeal,* 57 Pa. 43, 45 (1868). It is not conclusive of any item, such as interest, which the fiduciary "has omitted to charge himself with." *McLellan's Appeal (No. 1),* 76 Pa. 231, 232 (1874); see *Estate of John Vogle, Deceased,* 96 Pa. Superior Ct. 510 (1929).

This is particularly so in the case of a partial accounting. In a partial accounting, the fiduciary is normally concerned with securing court approval of proposed distributions. The balance of the fund will remain in his possession until the final accounting, at which time the parties will concern themselves with the question of its administration. If the fiduciary, at a partial accounting, wishes to protect himself on matters other than the proposed distributions, he must bring these matters to the court's attention. He cannot be relieved of his fiduciary duties with respect to the balance by remaining silent and allowing the court to concern itself with other questions.

The bank urges that the decision in *Lare Estate,* 368 Pa. 570, 84 A. 2d 334 (1951), forecloses inquiry into the scope of its fiduciary duties, from 1944 to 1949, with respect to the balance. But, in fact, one need only look at the record of that very case to see that in a partial accounting the parties are not concerned with the administration of the balance of the estate. In *Lare Estate* this Court noted that counsel who prepared the schedule of distribution, as well as the trial court, forgot to award the balance of the estate back to the bank. We awarded the balance back "for further accounting after termination of the will

contest." *Lare Estate,* 368 Pa. at 577, 84 A. 2d at 338. Under these circumstances, it is difficult to see how we can now foreclose such an accounting for those years.

The second point on which I must dissent is the majority's decision to limit the surcharge to six percent per annum. We are holding that the bank acted improperly in failing to invest these funds. Surely appellant is entitled to receive the amount of money he would have received if the bank carried out its fiduciary duties. I cannot say that this would amount to six percent per annum, nor do I understand how the majority has arrived at this figure. Further, no matter what the figure should be for any one year, we cannot apply some "average" rate of return to a balance which increased dramatically from year to year. For example, in 1949 the balance was approximately $50,000; in 1963, when interest rates were much higher, the balance was approximately $190,000. The bank must give appellant his due—no more, no less. In my opinion, we should remand to the chancellor for a determination of what the proper interest rate should be, not limited to six percent.

The determination of what interest the bank could have received is a factual one. This Court is not equipped to make such determinations, as a matter of first impression and on a silent record, nor are we permitted to guess at what the proper rate of interest should be. Accordingly, I would remand this case to the orphans' court so that it might determine the proper amount to surcharge the bank. And, as I stated above, I would not bar surcharge for the years 1944 to 1949.

Mr. Justice COHEN joins in this opinion.