# Lychos Trust

*Raymond J. DeRaymond* and *M. Paul Smith*, for corporate co-trustee.

*Arthur Piccone*, for individual co-trustee.

*Morris Efron* and *John M. Bray*, for objectors.

ADJUDICATION BY WILLIAMS, P.J., MAY 15, 1981:

This litigation involving objections to the accounts of the testamentary trustees of Anastassios A. Lychos and an effort to surcharge the trustees for negligent administration and other losses has been unduly protracted due in large measure to the failure of the corporate trustee to communicate with the beneficiaries and its apparent inability to file an intelligible accounting that conforms with either state or local rules of court.

The record consists of a first and final account, a restated first and final account, a supplement to the first and final account and a second and final account. Objections were filed to each of these "accountings". Interrogatories were submitted to and answers filed by the trustees. Hearings were held on September 19, 1978, September 18 and 19, 1979, and on July 14, 1980. Transcripts were prepared and the matter finally argued on January 6, 1981.

A. A. Lychos died July 14, 1968, a resident of Northamp-

ton County. Letters testamentary were granted to the Bloomsburg Bank—Columbia Trust Company of Bloomsburg, Pennsylvania, and to John O. Lychos, a son of the decedent. A first and final account of the executors was confirmed on February 22, 1971, and the entire residuary estate awarded back to the same fiduciaries for administration of a testamentary trust. This trust created a life estate for the decedent's wife with remainder over to her four children. The life tenant died in August, 1976, and her other three children are the present objectors.

The primary asset of the estate was a three-story commercial-residential building on Main Street in Bloomsburg, almost directly across the street from the bank, valued for estate purposes at $50,940. The award of distribution indicated that the estate was in a cash deficit position of $7,047 representing administrative expenses and fees and a loan made to the decedent during his lifetime.

While the estate was being administered, the trustees and three of the four remaindermen met and decided to retain the building as the primary asset of the estate and trust. The fourth child never objected to that decision. The far-reaching consequences for this estate could not have been foreseen.

At that time the entire building was leased to one tenant at a rental of $400 per month. This lease was to expire in July, 1971, and the trustees immediately began negotiations for a new lease. After negotiations with the current tenant failed, the trustees, principally by the individual co-trustee, John Lychos, negotiated a lease with a podiatrist, Dr. Marvin Hughes. This lease, executed on November 15, 1971, provided for a term of ten years at a monthly rental of $1,000 with an option for a ten-year renewal. The lease further required the lessors to make certain repairs to the building and to install an elevator. The trustees had not obtained a firm price for the elevator when the lease was executed.

To finance the repairs required by the lease, the trustees placed a mortgage on the building in March, 1972. The amount of the mortgage was $50,000 with the interest at the rate of 7½% per annum which resulted in monthly payments

of $629.09, including an escrow for taxes and fire insurance. At this time the property was valued at $75,000 including buliding and land. ***

## Fiduciary Standards

At the outset, it is appropriate to outline the standards by which the actions of the trustees are to be judged. In Pennsylvania a trustee is required to use such common skill and prudence in the administration of the trust as other prudent men would exercise in the management of their property: *Lerch Est.*, 399 Pa. 59. However, if the fiduciary has greater skill than the ordinary prudent man, then his actions must be judged according to the standard of a man with this special skill: *Lohm Est.*, 440 Pa. 268. Also, if a fiduciary procures his appointment by representing that he has greater skill than that of an ordinary prudent man, he will be held to have such skill as he represented: *Killey Trust,* 457 Pa. 474.

In this case it is clear that the corporate trustee is charged with having greater skill in the administration of trusts than the ordinary prudent man. The bank has a trust department headed by a man with fifteen years' experience in the administration of trusts and holds itself out as an expert in the administration of trusts. Mr. Boop, the vice president and head of the trust department, testified that his department manages a substantial portion of the commercial properties in Bloomsburg. In light of this, the bank must be held to a higher standard than that of the ordinary prudent man. In contrast, there is no evidence to suggest that trustee Lychos possesses greater skills than those of the ordinary prudent man or that he represented to the beneficiaries that he possessed such skills. He is a middle management executive for Bell Telephone Company of Pennsylvania and resided in Wilkes-Barre, Pennsylvania, approximately forty miles from Bloomsburg. Therefore, we are obliged to apply different standards to the two trustees.

It is clear that a trustee is generally not liable for a breach of trust committed by a co-trustee: *Herr v. U.S. Casualty Company,* 347 Pa. 148. However, every trustee is under a duty to participate in the administration of the trust and to use reasonable care to prevent a breach of trust by a

co-trustee: *Tracy v. Central Trust Company*, 327 Pa. 77; see also *Restatement of Torts 2d*, §§184 and 224. With these standards in mind, we turn to the specific claims of the objectors. ***

### The Mortgage

While the objectors contend that the corporate trustee failed to use proper judgment in mortgaging the principal asset of the trust, it is clear that it was legally entitled to do so and to use the proceeds to satisfy the debts carried over from the administration of the estate, including its own commissions, as well as to make repairs to the building. The corporate trustee cannot be surcharged merely because it failed to communicate all of the facts to its co-trustee.

However, there is no explanation for the bank's failure to invest the balance of the mortgage proceeds in anything other than a non-interest-bearing deposit account for a full year. This was a clear breach of its fiduciary duty and resulted in a loss of income to the estate: *Lare Est.*, 436 Pa. 1. We note that most of the funds were eventually paid out for the life tenant since the reduced income from the building was insufficient to care for her. We fix the loss to the trust chargeable solely to the corporate trustee at the 7½% mortgage interest rate which the trust was required to pay while the bank held the funds in its account or $1,125, and surcharge it that amount.

### Fire Insurance

The objectors' claim that the estate suffered a substantial loss due to the fire because the trustees failed to carry full replacement cost insurance on the building. The trustees contend that the amount of insurance represented actual cash value (replacement cost less depreciation) and that they were not obligated as fiduciaries to insure the replacement cost of the building. They also contend that the income did not permit payment of replacement cost premiums.

A considerable portion of the testimony was concerned with efforts on both sides to establish the actual cash value and replacement cost of the ninety-year-old building before the fire. It is clear that at the time of the testator's death the building was insured for $57,000; that at the suggestion

of a local broker who was familiar with the building in 1969, the coverage was increased to $80,000; and that in 1972 the same broker urged that the coverage be increased to $125,000. This broker also opined that the building had the same value in 1978.

The other witnesses on both sides calculated the actual cash value in 1978 to be either $95,000 or $166,000 depending upon the depreciation factor applied. The replacement cost estimates varied from $279,000 to $409,000. Most of these witnesses had limited personal knowledge, if any, of the building and were largely square footage replacement estimates using various construction indices.

In Mr. Boop's opinion the insurance of $80,000 carried by the trustees represented the market value or actual cash value of the building; not including the land, and was consistent with the estate and mortgage appraisals. There is evidence that the beneficiaries were advised of the increased coverage in 1969 and did not question the coverage until after the fire.

From the testimony it is also clear that during the period of administration, replacement cost insurance was available in the Commonwealth and in the Bloomsburg area for commercial buildings, but it is unclear whether any company would have issued such a policy for the building in question. Nevertheless, the objectors point to *Berkman vs Mellon National Bank,* 19 FIDUC. REP. 650, affirmed, per curiam, 441 Pa. 600, as authority for the trustees' duty to insure replacement cost.

Generally, a trustee has a duty to "make all reasonable expenditures necessary to preserve" the assets of the trust: PEF Code §3311, 20 Pa. C.S.A. §3311. Since a trustee is held to the standard of conduct of the ordinary prudent person who owns the type of property involved, it is clear that he has the authority and the duty to carry fire insurance on the assets: *Berkman, supra; Newcomer Est.,* 9 D. & C. 2d 99, 116; *Scott on Trusts,* 2d Edition, 176; *Bogert on Trusts,* §599.

*In Berkman,* supra, the beneficiaries of a trust sought to surcharge the trustees for failing to procure adequate fire insurance on the trust's principal asset, a commercial build-

ing. A fire occurred, causing a partial loss. The trustee obtained policies insuring the building for replacement cost less depreciation or actual cash value, but the face amount of the policies was less than that figure. An 80% co-insurance clause was applicable to partial losses and, because the trustee had not insured the full actual cash value, it became a co-insurer to the extent of the difference. This resulted in a loss to the estate and the trustee was surcharged for this amount. The adjudication was affirmed by an equally divided Supreme Court.

We do not construe *Berkman* to stand for the proposition that a trustee must insure total replacement cost rather than actual cash value. In any event the present case is clearly distinguishable in that the Lychos building was totally destroyed and no co-insurance clause was applicable the trustees received the face amount of the policies. Therefore, to determine whether the trustees breached their fiduciary duty by failing to maintain adequate insurance on the building, we must look to the circumstances surrounding the decision to insure the building to determine whether the requisite skill was exercised.

From the testimony it is clear that once the decision was made to retain the building, due consideration was given to the insurance question. The policies were increased during the estate administration. The estate appraisal of the building and land for inheritance tax purposes was $51,000 in 1969 and $75,000 in 1972 when the property was mortgaged. While $22,000 was expended for repairs in 1972, the evidence indicates that most of the these were necessary for maintenance rather than capital improvements. The estate was cash poor[2] and the needs of the life tenant, while relatively minimal, militated against increasing expenditures. The suggestion of an insurance broker to increase the insurance from $80,000 to $125,000 must be considered in light of the foregoing and Boop's opinion that the existing insurance fairly represented the value of the property. Significantly, the only

---

2. The cash flow problem was due to the bank's failure to collect the full rent and the delay in recovering the deficiency from the tenant.

testimony indicating that the property was under-insured for actual cash value prior to the fire came from the insurance salesman.

The trustees' duty to "preserve" an asset should not be interpreted to mean a duty to replace it new if a loss occurs. To rule otherwise would improperly make the trustee an insurer or guarantor of the trust res: *Killey Trust*, 457 Pa. 480. The evidence adduced by the objectors fails to establish that an ordinary prudent businessman would have obtained replacement insurance on the Lychos building. In summary, the objectors have not carried their burden of proving wrongful conduct by the trustees or that the estate suffered a loss from their action: *Killey Trust*, supra.

### Commissions and Fees

Finally, objectors contend that the negligent administration of the trust and inadequate accounting entitle them to attorneys fees. Also they seek to have the trustees surcharged for their attorneys fees in this litigation and denied any compensation.

The objectors claim counsel fees and costs resulting from this litigation in the sum of $54,726. No substantiation is provided for this claim, although such evidence would doubtless be supplied. It is only in exceptional cases that an objector's counsel fees will be paid from the trust fund: *Sower's Est.*, 383 Pa. 566. This is not such a case because the trust fund is not in danger of depletion and objectors were merely protecting their own interest. Further, there is no authority for surcharging the trustees an amount equal to objectors' counsel fees. Trustees are liable only for losses suffered by the trust as a result of a breach of a fiduciary duty: *Estate of Stetson*, supra.

Initially, we note that no commissions on principal or income are claimed by the individual co-trustee. In the second and final account the corporate trustee claims a commission on principal of $903.76 or approximately 2% of the value of the estate and $3,561.44 in commissions on income, or 5% during the administration of the trust. In addition, the trustees claim credit for counsel fees in the sum of $3,525 and expenses of $813.68 resulting from the present litigation

through October, 1979. Presumably, this has also increased since that time.

A trustee is entitled to full and fair compensation for its services: 20 Pa. C.S.A. §7185; *Matter of Ritzman,* 479 Pa. 475. In determining the reasonableness of compensation, consideration is to be given to the extent and character of the work performed and the responsibility involved: *Thompson Est.,* 426 Pa. 270. In the absence of a specific agreement, the allowance of fees and commissions is within the discretion of the court: *Ibid.; In re Reed,* 467 Pa. 371.

In determining the corporate trustee's right to compensation in this matter, we must examine what was as well as what was not done. The bank did perform the customary duties of a trustee; however, in a variety of instances, it has been guilty of at least supine negligence as defined in *Berkman,* supra: " 'Supine' as pointed out in Oxford Dictionary, carries with it the thought of passiveness and inaction rather than active wrongdoing. It means dereliction and inattentiveness to duty; literally 'lying down'. " (p. 653). It is this image of "lying down" that persists with respect to the corporate trustee throughout the period of administration in this estate.

Thus, while Mr. Boop had extensive experience with real estate management in Bloomsburg, he permitted an inexperienced co-trustee to negotiate the terms of a lease for the trust's sole asset. While Boop stated he thought the lease "a fine one for the Bloomsburg area", we are forced to speculate how much more favorable a lease could have been negotiated with the advantage of the bank's expertise in such provisions as the lessor's agreement to install an elevator.

The trustees' failure to institute suit for back rental payments did not ultimately result in a cash loss to the estate as has been seen. However, the failure to do so for three and a half years after the conflict of interest of the bank's counsel was inexcusable. It caused the poor cash flow problem and adversely affected the life tenant.

The bank's inexcusable handling of the mortgage proceeds and the consequent loss to the estate have been noted.

Finally, a considerable portion of the present litigation

is the direct result of the trustees' failure to file an adequate accounting and to provide the beneficiaries with supporting data. The first accounts so commingled and confused principal and income items and debts and credits that any beneficiary or their counsel would become alarmed and dubious of the accounting. There was scarcely an item in the accounts which did not require further explanation and some items are still misplaced in the "Second and Final Account".

In arriving at our decision we are constrained by the language of *Stehman's Ap.*, 5 Pa. 413, quoted with approval in *Locher's Est. (No. 2)*, 219 Pa. 46 at page 51:

"Compensation to trustees is allowed . . . as the reward of faithful execution of the trust confided. Integrity, industry, intelligence and enlightened activity in the trustee are the qualities which command reward. To compensate sloth, ignorance, reckless confusion and procrastinating delay, by which the interests of the cestui que trust are impaired, instead of being promoted, would be to prevent the very object our system has in view in allowing compensation to trustees, by offering a premium to incapacity or dishonesty."

For the foregoing reasons we will allow the trustees' commission on principal in the sum of $903.76 but reduce the total commission on income from $3,564.41 to $1,000 and surcharge the difference to the corporate trustee.

The final exception of the objectors relates to the expenses and counsel fees of the trustees in defending this litigation. The general rule is that reasonable counsel fees are properly chargeable to the trust estate where the trustee successfully defends objections to its account. However, counsel fees will be reduced or not allowed to a negligent fiduciary. *Lare Est.*, 436 Pa. 1; *Kenin's Trust Est. (No. 1)*, 343 Pa. 549; *Lavino Trust*, 30 FIDUC. REP. 176.

In the present case more than one-half of the testimony related to the issue of the trustees' duty to obtain replacement cost insurance, an issue decided in favor of the trustees. The balance of the testimony and issues, approximately 40%, related to the failures of the trustees discussed above. Accordingly, we will reduce the counsel fees charged against the

estate by the corporate trustee by 40% and require the individual trustee to bear his own counsel fees.

## Jackson Estate

*Rosemary C. McMunigal,* for estate.

*Charles F. Mayer,* pro se.

OPINION OF DIGGINS, S. J., SEPT. 30, 1980:

This opinion is in response to a petition by counsel for Beatrice M. Jackson, the surviving spouse of Robert F. Jackson. The petition is for the allowance of counsel fees as a claim against the estate. Mrs. Jackson has questioned the reasonableness of the amount charged and the estate raises the general rule that where a party has retained counsel to protect such party's interest, counsel must be paid by that party.

The court will first consider the services performed for which compensation is sought. Charles F. Mayer, Esq.,